**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

JOHNNY GRAYS, MIKAL WILLIAMS,
and JERMAINE O. BRODERICK, SR.,

                Plaintiffs,

v.                                         Case No. 21-10526

ALEJANDRO N. MAYORKAS,

                Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS AND SETTING DEADLINE
FOR PLAINTIFFS TO FILE AN AMENDED COMPLAINT**

Plaintiffs Johnny Grays, Mikal Williams, and Jermaine O. Broderick, Sr., work as

officers for Defendant Customs and Border Protection ("CBP"). (ECF No. 1.) They

allege that, while working for Defendant, they observed CBP employees discriminating

against the general public on the basis of race. In addition, Plaintiffs allege they were

subject to racial discrimination. In their complaint, they bring claims under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.

.      Defendant moves to dismiss the complaint. (ECF No. 12.) The matter has been

fully briefed (ECF Nos. 15, 16), and the court does not find a hearing to be necessary.

E.D. Mich. LR 7.1(f)(2). For the reasons provided below, Defendant's motion will be

granted in part and denied in part.

## I.   BACKGROUND

The following facts are either alleged in Plaintiff's complaint or agreed upon by

the parties. In a motion to dismiss, the court accepts Plaintiff's factual allegations as true

but makes no overt finding as to truth or falsity. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs are CBP officers stationed at the Blue Water Bridge, an international bridge connecting Canada to Port Huron, Michigan. (ECF No. 1, PageID.3.) Grays began working for Defendant in August 2008; Williams began working in July 2019; and Broderick started in June 2019. (*Id.*) Plaintiffs claim they were subjected to a hostile work environment due to discriminatory treatment directed at the traveling public and directed at them. (*Id.*, PageID.4.)

In the complaint, Plaintiffs describe allegedly discriminatory actions taken against the traveling public. They allege African American travelers were subjected to additional inspections and unprofessional interviews due to the travelers' race. (*Id.*, PageID.4-5.) In February 2020, Grays observed 17 African American men returning from Toronto in two cars. (*Id.*, PageID.5.) CBP officers allegedly treated the men disrespectfully, and the complaint states this was due to the men's race. (*Id.*) In March 2020, Grays was ordered to make a stop of a vehicle, which his supervisor described as "suspicious." (*Id.*) The vehicle was driven by an African American family, and the complaint alleges that a similarly situated Caucasian family would have been treated differently. (*Id.*, PageID.5-6.) Grays questioned the decision to stop the car, and the CBP officers involved, including Grays, were brought into the Chief CBO Officer's office. (*Id.*, PageID.6.) The Chief Officer, Andrew Beaudry, stated that the CBP officers who conducted the stop "did a good job." (*Id.*, PageID.6.)

In October 2020, Williams and Broderick observed an African American family that turned by accident onto the Blue Water Bridge. (*Id.*) The driver did not have a valid

license, and Beaudry directed CBP employees to report the driver to local police. (*Id.*) Police declined to intervene but Beaudry threatened to arrest the driver unless another individual came to drive the vehicle home. (*Id.*) According to the complaint, this interaction would not have occurred but for the family's race. (*Id.*) In February 2021, Williams observed that two African American male travelers were removed from their car, given a criminal background check, and had their vehicle inspected because they turned into an incorrect lane. (*Id.*, PageID.6-7.) Plaintiffs again claim these CBP actions would not have occurred had the travelers not been African American. (*Id.*)

Plaintiffs also allege discriminatory treatment directed at them. "Several times each year," the complaint states that the CBP Chief of Staff asked Grays questions regarding his duty station, including: "Why are you here?"; "Why are you here at Blue Water Bridge in Port Huron, MI?"; "You're from Detroit, right?"; "How do you still have your job?"; "Why haven't you been fired yet?" (*Id.*, PageID.7-8.) Plaintiffs assert that these questions were asked due to Grays' race. (*Id.*) Further, "on numerous occasions" between December 2009 and the date of the complaint, CBP officers and supervisors asked to touch Grays' hair. (*Id.*, PageID.8.) Grays declined the requests due to their offensive nature, but the requests continued. (*Id.*) In 2018, the complaint states that Grays was reported as a "Black man with a gun" to the CBP, and Defendant's employees did not "promptly close the matter, causing Grays to needlessly remain under investigation." (*Id.*) A CBP employee allegedly told Grays that he could "blend in with protesters" and could "tell the protesters [his] name is Indike Mfufu." (*Id.*, PageID.9-10.)

Williams states that another CBP employee attempted to intimidate Williams by touching on his thigh, arm, and chest between December 2019 and May 2020. (*Id.*, PageID.8-9.) Broderick states that CBP officers made disparaging comments toward Afro-Caribbean food he ate, for instance, by calling the food "dog meat." (*Id.*, PageID.9.) In addition, CBP officers allegedly questioned Broderick's receipt of an award and asked how long his probationary period lasted, which Plaintiffs claim was a threat directed at Broderick's continued employment. (*Id.*) In June 2020, a picture of Broderick and Williams in uniform was placed on an official CBP twitter page, which Plaintiffs claim was to present them as "tokens" to the public. (*Id.*, PageID.10.) During the summer of 2020, CBP officers were told to limit public disclosure of their employment status as law enforcement officers due to safety concerns. (*Id.*) Williams asked that his photograph be removed from the Twitter page, but a CBP supervisor refused. (*Id.*) According to the complaint, the photo was removed only when a white female officer also depicted in the photo asked to have it removed. (*Id.*)

Plaintiffs complained of discrimination and filed complaints with the Equal Employment Opportunity Office, and they received their right to sue letters in January and February 2021. (*Id.*, PageID.10-11.) In the complaint, Plaintiffs state that "[a]lmost immediately after" they submitted verbal and written complaints, Defendant's employees retaliated against them. (*Id.*, PageID.11.) On April 7, 2020, Grays' supervisors required that he submit a doctor's note to take a day of sick leave. (*Id.*) Plaintiffs allege the day was Grays' scheduled day off and CBP contracts and policies did not require such documentation. (*Id.*) On April 8, 2020, Grays approached his supervisors about "this apparent breach of protocol" and the supervisors "rapidly approach[ed] him and plac[ed]

4

their hands on him." (*Id.*) Following the confrontation, CBP officials issued a cease and desist letter demanding that Grays' union stop requesting statements regarding the incident, and the agency opened an investigation into Grays' behavior toward his supervisors that day. (*Id.*, PageID.11-12.) CBP employees then revoked Grays' authority to carry a service weapon and placed him on "desk duty." (*Id.*, PageID.12.) According to the complaint, the investigation was initiated due to Grays' race and in retaliation for his complaints about racial discrimination at the CBP. (*Id.*) At the time the complaint was filed, Grays was still under investigation and he still remained on desk duty. (*Id.*) Defendant has allegedly not provided Grays detailed information on the investigation other than notifying Grays that it is still ongoing. (*Id.*, PageID.12.)

While on desk duty, Grays alleges that he is subject to "ongoing harassment." (*Id.*, PageID.13.) Grays states that his supervisor notified him in May 2020 that he is prohibited from leaving his desk and instructed him that approval is needed before he could use the restroom. (*Id.*)

Plaintiffs filed the instant complaint on March 9, 2021. (*Id.*) On May 11, 2021, Defendant filed a motion to dismiss. (ECF No. 12.)

## II.  STANDARD

Under Rule 12(b)(6), a party can move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When reviewing motions under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "To survive a motion to dismiss, a complaint must contain factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The plaintiff must present "more than labels and conclusions." *Twombly*, 550 U.S. at 545. "[A] formulaic recitation of a cause of action's elements will not do." *Id.*

When reviewing a motion to dismiss, the court "may not consider matters beyond the complaint." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009). However, the court may consider "documents incorporated into the complaint by reference . . . and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The court may also consider "a document that is not formally incorporated by reference or attached to a complaint" when "[the] document is referred to in the complaint and is central to the plaintiff's claim." *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999).

### III. DISCUSSION

The complaint includes four counts. All three Plaintiffs bring claims of racial discrimination against Defendant under Title VII (Count I) and under § 1981 (Count III), and Grays brings a claim of retaliation under Title VII (Count II) and § 1981 (Count IV). Defendant moves to dismiss all four counts of the complaint.

The court will first consider Plaintiffs' § 1981 claims. It will then turn to the Title VII discrimination claim and the Title VII retaliation claim. Finally, the court will address Plaintiffs' intent to add retaliation claims on behalf of Broderick and Williams.

## A.  Section 1981

Defendant argues that the § 1981 claims must be dismissed because Title VII preempts claims of racial discrimination made in the federal employment context. (ECF No. 12, PageID.66.) It is well established that "[f]ederal employees must rely upon Title VII and other federal antidiscrimination statutes like the ADEA that apply to the federal government as the exclusive remedy for combating illegal job discrimination. In amending Title VII and other federal statutes to include federal employees, Congress created an exclusive judicial remedy for claims of discrimination in federal employment." *Briggs v. Potter*, 463 F.3d 507, 517 (6th Cir. 2006); *accord Walker v. Henderson*, 4 F. App'x 248, 249 (6th Cir. 2001) ("[A] federal employee alleging employment discrimination may proceed only under Title VII and may not proceed under § 1981.").

Plaintiffs, in their response, do not defend the § 1981 claims and agree that dismissal is warranted.[1] (ECF No. 15, PageID.146.) Thus, the court will grant Defendant's motion to dismiss as to Plaintiffs' § 1981 claims.

---

[1]    In the motion to dismiss, Defendant stated, pursuant to Local Rule 7.1(a), that it sought concurrence from Plaintiffs on the relief requested in the motion. (ECF No. 12, PageID.49.) According to Defendant, "concurrence [from Plaintiffs] was not forthcoming." (*Id.*) Nonetheless, after Defendant filed its motion, Plaintiffs stated that they were actually in agreement with Defendant and believed dismissal of the § 1981 claims was justified. Local Rule 7.1(a) mandates that parties engage in good-faith discussions before filing a motion. Here, either Defendant did not adequately explain the nature of the motion or Plaintiffs did not fully engage in efforts to reach areas of agreement without the need for a motion. Motions that are not contested constitute a waste of the court's time and impose unnecessary legal costs on clients. Counsel are admonished to avoid the unwarranted withholding of concurrence.

### B.  Title VII Discrimination

Plaintiffs bring claims of Title VII discrimination. Although not clarified in the complaint, they state in briefing that the claims are divided into two categories: 1) a disparate treatment claims brought by Grays alone; and 2) claims of hostile work environment brought by all three Plaintiffs. (ECF No. 15, PageID.137-46.)

### 1.  Disparate Treatment

Under 42 U.S.C. § 2000e-2(a)(1), an employer cannot "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." To bring a standard claim of Title VII discrimination, a plaintiff must allege that he: "1) is a member of a protected class; 2) was qualified for his job; 3) suffered an adverse employment decision; and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606-07 (6th Cir. 2019) (quotations removed).

Defendant contests only the third element of Grays' claim, whether he suffered an "adverse employment decision." *Id.* (ECF No. 12, PageID.72-73.) Recognizing the need to limit litigation "based upon trivial workplace dissatisfactions," *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004), courts have required Title VII plaintiff to show that, due to their employers' actions, the plaintiffs experienced a "materially adverse change in the terms or conditions of employment." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (quotations removed). "A bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is

insufficient to state a claim. *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004) (quotations removed). Thus, merely opening an investigation without "chang[ing] the form or conditions of . . . employment," *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 626 (6th Cir. 2013), or issuing a written reprimand without "lowered pay, demotion, suspension, or the like," *Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013), cannot state a Title VII discrimination claim. However, in cases of "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," the requirement of an adverse employment action has been met. *Redlin*, 921 F.3d at 607.

Plaintiffs argue that Grays' reassignment to desk duty in April 2020 constitutes an adverse employment action. In their response, Plaintiffs point to allegations that CBO officials placed Grays under investigation after a confrontation Grays had with his supervisor. (ECF No. 15, PageID.138; ECF No. 1, PageID.11-12.) According to the complaint, Defendant required Grays to turn in his service weapon and assigned him to "desk duty." (ECF No. 1, PageID.12.) Grays' placement in an administrative role allegedly prevented him from performing his regular duties as a CBP officer and resulted in a loss of status, overtime pay, and barred him from obtaining employment elsewhere in the agency. (*Id.*, PageID.13.) In addition, Grays was told to work at a desk just outside his supervisor's office, and, while stationed there, the supervisor engaged in "ongoing harassment." (*Id.*) Further, a CBP supervisor allegedly instructed Grays that he was prohibited from leaving his desk and that he must obtain permission before going to the restroom. (*Id.*)

"[R]eassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *White*, 364 F.3d at 797 (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). However, a reassignment can qualify as an adverse employment action when "it constitutes a demotion evidenced by a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* (quotations removed).

Many cases involving adverse employment actions, including cases in which the employee is reassigned, involve an effect on pay and benefits. *See*, *e.g.*, *Redlin*, 921 F.3d at 608 (holding that a school district had taken an adverse employment action when it transferred an administrator from a high school to a middle school, resulting in a "lower rate [of pay]" for the administrator). However, Sixth Circuit precedent demonstrates that this is not the sole consideration. In *White v. Burlington Northern & Santa Fe Railway Co.*, the Sixth Circuit held that an employer took an adverse employment action against a forklift operator when the employer placed the operator in a "dirtier" position with less "prestige." 364 F.3d at 803. In addition, in *Spees v. James Marine, Inc.*, the Sixth Circuit held that a welder had established a genuine dispute of fact as to whether a construction company took an adverse employment action against her when the company placed the welder in a "more boring" job with lower status. 617 F.3d 380, 391-92 (6th Cir. 2010); *see also Barrow v. City of Cleveland*, 773 F. App'x 254, 264 (6th Cir. 2019) (holding, under the less arduous standard for adverse employment actions in the Title VII retaliation context, that a jury could find that a police officer's assignment to "desk duty" constituted an adverse employment action).

10

At the pleading stage, the court must accept as true the facts alleged in the complaint. *Ashcroft*, 556 U.S. at 678. The complaint states that Grays was moved from his previous position interacting with the traveling public at the Port Huron-Canadian border to a desk job, with his right to carry a weapon revoked, less access to overtime pay, and direct oversight from a harassing supervisor. (ECF No. 1, PageID.12-13.) In addition, the complaint states that Grays experienced a "loss of status" when he was transferred to administrative duties. (*Id.*, PageID.13.) Further, according to the complaint, Grays was instructed not to leave his desk and ask for permission to go to the restroom. (*Id.*) These actions were taken in conjunction with an investigation Plaintiffs allege was "maliciously instigated." (ECF No. 1, PageID.12-13.)

The facts in the complaint, taken together, plausibly allege that Grays experienced a "demotion," *White*, 364 F.3d at 797, and a "reassignment with significantly different responsibilities." *Redlin*, 921 F.3d at 607. It is true that an investigation of an employee by itself does not generally constitute an adverse employment action, and Grays' placement on desk duty was a result of an ongoing investigation. *Kuhn*, 709 F.3d at 626; *accord Peltier v. United States*, 388 F.3d 984, 988-89 (6th Cir. 2004). However, like the forklift operator in *White* and the welder in *Spees*, Plaintiffs have alleged that Defendant reassigned Grays to a less prestigious, less desirable, and materially inferior position; the existence of an investigation is not the sole basis for Plaintiffs' claim. *See White* 364 F.3d at 803; *Spees*, 617 F.3d at 391-92; *Kuhn*, 709 F.3d at 626. Thus, the court will deny Defendant's motion to dismiss as to the Title VII disparate treatment claim.

## 2.  Hostile Work Environment

Under Title VII, 42 U.S.C. § 2000e-2(a)(1), courts have recognized that a plaintiff can establish a claim of discrimination "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)). A hostile work environment claim has both an objective and subjective component. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview[,] likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quotations removed).

"Rather than considering each event complained of in isolation, [courts] must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). Courts often consider "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's performance." *Id.* (quoting *Harris*, 510 U.S. at 23).

To establish a hostile work environment claim, Title VII plaintiffs must meet a high bar. *See Khalaf v. Ford Motor Co.*, 973 F.3d 469, 485 (6th Cir. 2020) ("This

standard sets a high bar for plaintiffs in order to distinguish meaningful instances of

discrimination from instances of simple disrespect."); *accord Phillips v. UAW Int'l*, 854

F.3d 323, 328 (6th Cir. 2017). As the Sixth Circuit explained in *Williams v. CSX Transp.*

*Co., Inc.*:

> "[I]solated incidents (unless extremely serious) will not amount to
> discriminatory changes in the terms and conditions of employment."
> *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141
> L.Ed.2d 662 (1998). Occasional offensive utterances do not rise to the
> level required to create a hostile work environment. *Grace v. USCAR*, 521
> F.3d 655, 679 (6th Cir.2008). "To hold otherwise would risk changing Title
> VII into a code of workplace civility, a result we have previously rejected."
> *Id.*

643 F.3d 502, 512-13 (6th Cir. 2011).

The high standard for hostile work environment claims is demonstrated in Sixth

Circuit precedent. In a line of cases, the Sixth Circuit has held that demeaning, hateful,

and sometimes malicious behaviors and statements do not meet the standard of hostile

work environment when the workplace is not sufficiently "permeated" with abuse and

discrimination. *Williams*, 187 F.3d at 560.

In *Barrett v. Whirlpool Corp.*, the Sixth Circuit held that a Caucasian woman,

working at a refrigerator manufacturing facility, did not have a valid hostile work

environment claim for actions taken against her for supporting African American

employees. 556 F.3d 502. The woman was called a "bitch" and told to "mind her own

business" by a co-worker when she opposed racist statements; when she reported the

statement to her supervisor, the supervisor told her to "leave it alone." *Id.* at 507. The

woman approached the co-worker and told him she did not like his language, and he

said he "had a nine-millimeter gun." *Id.* In addition, the woman stated that a human

resources manager directed desirable work away from the woman because of her

support for African Americans, and a non-supervisory group leader ignored her requests for assistance. *Id.* at 508. The woman testified that white employees "gave her the cold shoulder, snubbed her, and would not talk to her." *Id.* The Sixth Circuit noted the primary facts of the case and reasoned that the woman, as a matter of law, had not shown that the harassment recounted was "severe or pervasive." *Id.* at 517-18.

In *Williams v. CSX Transportation Co.*, the plaintiff, the sole African American employee performing janitorial work, recounted a history of favored treatment given to Caucasian employees. 643 F.3d 502. She stated that she was required to clean feces off the wall of a restroom and in urinals, strip a restroom floor without appropriate tools, drive to different locations without reimbursement, and had her car "keyed" and tires punctured. *Id.* at 505-06. According to the plaintiff, Caucasian employees were not given the same treatment. *Id.* In addition, a supervisor allegedly told the plaintiff that "she was a Democrat only because she was a black woman." *Id.* at 506. The supervisor also stated that "this country should get rid of Jesse Jackson and Al Sharpton because without those two monkeys the country would be a whole lot better." *Id.* The following day, the supervisor added that, if the plaintiff returned to school, "she would not have to pay for her education because she was a single black mother." *Id.* On different occasions, the supervisor asked the plaintiff "why black people cannot name their children stuff that people can pronounce, like John or Sue," and told the plaintiff that "black people should go back to where they came from." *Id.* Soon thereafter, the plaintiff was terminated from her position. *Id.* Upon reciting the material facts, the Sixth Circuit held that the plaintiff did not as a matter of law present a valid hostile work environment claim. *Id.* at 513. The court reasoned that the plaintiff did not indicate that the

14

statements made to her were sufficiently frequent or made over a long period of time, and the behavior described, while "insensitive, ignorant, and bigoted," "more closely resemble[d] a mere offensive utterance." *Id.* In conclusion, the court stated that the conduct was "isolated" and was not "severe" enough to establish a valid claim. *Id.*

Finally, in *Phillips v. UAW International*, the plaintiff was an African American employee at a union. 854 F.3d 323. According to the plaintiff, a union officer listed union representatives by name and singled out the representatives who were African American as ones he would fire. *Id.* at 325. Another union officer told the plaintiff that they "need[ed] to put a black on staff" and asked if the plaintiff was interested. *Id.* In the plaintiff's presence, a union officer told another African American employee "oh, because you're big and black . . . [y]ou're her bodyguard, I'm supposed to be afraid of you." *Id.* The officer also said: "the problem with the Union was that there are too many blacks in the union." *Id.* In addition, the plaintiff stated that the officer at issue "often behaved violently, . . . made frequent racial comments, and . . . spoke in a condescending tone when dealing with black union members as compared to white members." *Id.* The plaintiff apparently observed the officer separating union grievances into "black" and "white" piles, and the officer told the plaintiff that "he intended to withdraw the grievances filed by African–American union members." *Id.* The Sixth Circuit reviewed several of Sixth Circuit precedents that limited the scope of hostile work environment claims. *Id.* at 328 (citing *Clay v. United Parcel Service*, 501 F.3d 695, 708 (6th Cir. 2007)) (noting that fifteen instances of racially motivated comments and actions, including placement in a difficult job that caused a groin injury with six months of rehabilitation, was not a hostile work environment under Title VII). The court

15

concluded that, although the union officials' behaviors were "offensive and condemnable," they were "isolated and not pervasive or severe enough to alter the terms and conditions of Phillips's employment." *Id.*

Because a hostile work environment claim fails if "if the victim does not subjectively perceive the environment to be abusive," *Barrett*, 556 F.3d at 514, the court must analyze "each employee individually and limit[] its analysis to those events that were either perceived by an individual employee or that the employee knew about." *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 717 (6th Cir. 2012).

**i. Broderick and Williams**

The complaint states that Plaintiffs observed CBP officials applying enhanced scrutiny to African American travelers crossing the border at Port Huron, and that they observed unprofessional interviews of African American travelers. (ECF No. 1, PageID.4-5.) Specifically, Broderick and Williams observed CBP officers inform an African American family in October 2020 that someone needed to pick up their vehicle to drive it home because the family did not carry a valid driver's license. (*Id.*, PageID.6.) According to the complaint, this would not have happened to a similarly situated Caucasian family. (*Id.*) In addition, Williams observed CBP officers in February 2021 subject two African American travelers to additional scrutiny, a criminal record check, and a vehicle inspection. (*Id.*) The complaint states this would not have happened but for the travelers' race. (*Id.*)

Defendant argues that discriminatory treatment toward third parties, who are not employees, is not relevant to the inquiry of hostile work environment. (ECF No. 12, PageID.76-78 (quoting *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 136 (2d Cir.

1999)) ("It is inherent in the definition of a racially hostile work environment, however, that the person against whom the hostility is directed must be in an employment relationship with the employer.").) They correctly note that the text of Title VII, 42 U.S.C. § 2000e-2(a)(1), discusses discrimination only in the employer-employee context. The statute makes it unlawful for "an employer" to discriminate against an individual on the basis of "his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). The statute makes no mention of individuals outside the employment relationship or the general public. *See Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 434-36 (6th Cir. 2004) (comparing Title VII's prohibition on employment discrimination to state law barring discrimination against customers in places of public accommodation); *Hunter v. Sec. of U.S. Army*, 565 F.3d 986 (6th Cir. 2009) ("Title VII prohibits discrimination in employment.").

However, the Sixth Circuit has recognized that "offensive conduct need not be directed at the plaintiff," *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009), and the court's analysis is not limited to "to the narrow set of incidents directed at the plaintiff or occurring in the plaintiff's presence." *Barrett*, 556 F.3d at 515. But, when courts analyze behavior directed at other individuals, the behavior is primarily against other employees in a work context. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999) (reviewing evidence of "racist conduct affecting African–American employees"); *Barrett*, 556 F.3d at 517-519 (considering whether discriminatory actions were taken against co-workers in the same protected class); *Phillips*, 854 F.3d at 328 (analyzing a racial comment made to a co-worker). Plaintiffs fail to cite a single case where discrimination against clients or non-employees, or

17

statements made outside the work environment, supported a valid claim of hostile work environment. *See, e.g., Strickland v. City of Detroit*, 995 F.3d 495, 506-08 (6th Cir. 2021) (holding that racially charged comments by co-workers on social media pages, racial terminology directed at an African American co-worker, denying the plaintiff shift assignments and training, and observations of disrespect directed at the plaintiff and his African American co-workers did not establish a valid hostile work environment claim). Furthermore, when a court considers conduct not directed at the plaintiff, that conduct has "diminishe[d] . . . severity" and is "afforded less weight." *Id.* (quoting *Ladd*, 552 F.3d at 501).

However, Broderick and Williams do not solely rely on disparate treatment and increased scrutiny CBP officers applied to African American travelers in the general public. According to the complaint, a CBP field training officer "touched" Williams in an intimidating manner on his thigh in December 2019, on his arm in February 2020, and on his chest and shoulder on May 2020. (ECF No. 1, PageID.8-9.) At another instance, the field training officer told Williams he should bring a cup of coffee with him to conduct interviews with the traveling public, and when Williams stated that would be unprofessional, the field training officer stated Williams "needed to watch what he said until he was off on the job training." (*Id.*, PageID.9.) Broderick stated that, when ordering Afro-Caribbean food, the same field training officer referred to the food as "dog meat." (*Id.*) The field training officer allegedly made disparaging comments on Broderick's Afro-Caribbean food on other occasions. (*Id.*) Further, on one occasion, that same field training officer stated that Broderick should not have received a reward, and he asked Broderick, in an apparent threatening manner: "When are you off probation? Isn't it 2

years for veterans?" (*Id.*) According to the complaint, Broderick had over a year left on probation. (*Id.*) Finally, a picture of Williams and Broderick in their CBP uniforms was placed on a CBP social media page at a time of social hostility toward police officers. (*Id.*, PageID.10.) Williams asked that the picture be taken down, and the picture was taken down only after a Caucasian officer asked to have it removed. (*Id.*)

Taking the allegations in the complaint as true, *Ashcroft*, 556 U.S. at 678, Broderick has not stated a valid claim for hostile work environment as a matter of law. First, Broderick witnessed CBP officers requiring an African American family to get someone with a valid license to drive a car home. (ECF No. 1, PageID.6.) While Broderick may have observed the CBP officers treat African American travelers differently, notably, these actions did not involve racial slurs, overt racial comments, or physical attacks or violence. In fact, the complaint does not allege, nor do Plaintiffs argue, that requiring a driver who passes through an international border to hold a valid driver's license is illegal or in any way improper. The complaint alleges merely that a Caucasian family would not be treated similarly. Given the limited, if any, weight a court must give toward conduct directed at third-parties with no connections to employment relationships, and the "diminishe[d]" weight courts give generally to actions not directed at Title VII plaintiffs, *Strickland*, 995 F.3d at 506-08, Broderick's observations of greater scrutiny toward African American travelers do not materially advance his claim of hostile work environment.

For actions taken directly against Broderick, making disparaging comments on his food choices, stating that he did not deserve a reward, pointing out his probationary status, and placing a professional picture on his employer's official social media page, if

anything, amount to no more than "[o]ccasional offensive utterances" and "isolated incidents" of insufficient seriousness. *Williams*, 643 F.3d at 512-13.

Considering the "totality of the circumstances" alleged in the complaint, *Randolph*, 453 F.3d at 733, Broderick's experiences simply do not meet the "high bar" set for hostile work environment claims. *Khalaf*, 973 F.3d at 485. Even assuming the truth of Broderick's allegations, the plaintiffs in *Barrett*, *Williams*, and *Phillips* all experienced more serious, and more consistent, discriminatory treatment. *Barrett*, 556 F.3d at 507-08 (plaintiff testifying that employees called her "bitch," told her to "mind her own business," informed her that another employee possessed a "nine-millimeter gun," directed work and resources away from her, and ignored her at work); *Williams*, 643 F.3d at 502-06 (plaintiff stating that she was asked to do humiliating work and work without proper tools, unlike Caucasian co-workers, and that she had her car keyed, heard a supervisor refer to Jesse Jackson and Al Sharpton as "monkeys," and told by a supervisor that "black people should go back to where they came from," among other statements); *Phillips*, 854 F.3d at 325 (plaintiff observing union officer separating employees by race and stating he would fire the African American employees, referring to another African American employee as "big and black" and someone "to be afraid of," stating "there are too many blacks in the union," speaking in a condescending voice to African American employees, and taking other discriminatory actions). Yet, under existing Sixth Circuit law, the plaintiffs in *Barrett*, *Williams*, and *Phillips* did not establish valid hostile work environment claims. Thus, dismissal of Broderick's claim is warranted.

Williams' claim largely tracks Broderick's. In addition to the driver's license incident with the Texas family that both Williams and Broderick observed in October

2020, the complaint alleges that Williams also observed CBP officers applying additional investigative scrutiny toward two male African American drivers in February 2021. (ECF No. 1, PageID.6.) However, like the incident with the Texas family, the complaint does not allege, nor do Plaintiffs argue, that subjecting travelers at an international border to investigative scrutiny, performing a criminal record check, and inspecting a vehicle are in and of themselves illegal or improper. (*Id.*) Plaintiffs instead assert that the additional scrutiny, whether improper or not in isolation, would not have been applied to Caucasian travelers. (*Id.*) Furthermore, the complaint does not allege that, in processing these stops, CBP officers referenced racial stereotypes, used racial slurs or epithets, or physically assaulted passengers on the basis of race. (*Id.*)

Williams did not allegedly have his favored cuisine ridiculed and called "dog meat" like Broderick, and, unlike Broderick, Williams did not receive statements that he did not deserve a reward and questions regarding probationary status. But, according to the complaint, a CBP field training touched Williams in an intimidating manner. (*Id.*, PageID.8-9.) In addition, Williams was directed to carry a cup of coffee and was scolded for refusing to do so. (*Id.*, PageID.9.) As with Broderick, Williams' photo was placed on a CBP social media page. (*Id.*, PageID.10.)

The increased scrutiny of African American passengers Williams allegedly observed, being admonished for not carrying a cup of coffee, and having his photo placed on a professional social media page do not meet the standard established by the Sixth Circuit for hostile work environment claims. *Strickland*, 995 F.3d at 506-08; *Williams*, 643 F.3d at 512-13; *Barrett*, 556 F.3d at 507-08; *Phillips*, 854 F.3d at 325. However, Williams did experience touching, and courts, when reviewing hostile work

21

environment claims, consider as an additional factor "whether [the alleged discriminatory conduct] was physically threatening or humiliating." *Randolph*, 453 F.3d at 733.

Nonetheless, the mere existence of physical touching is not dispositive, and the Sixth Circuit has held that more aggressive and harmful behavior failed to establish a hostile work environment claim. *See, e.g., Clark v. United Parcel Serv.*, 400 F.3d 341, 344-47, 351-52 (6th Cir. 2005) (allegations in a sex discrimination case that manager on separate occasions made sexual jokes "at least once a month," placed a vibrator on the plaintiff's thigh and asked if it "felt good," grabbed the plaintiff's overalls and tried to look down them did not present a valid hostile work environment claim); *Clay*, 501 F.3d at 700-03, 707-08 (holding that fifteen specific instances of racially motivated ridicule, comments, and employment actions, including intentionally placing the plaintiff in a heavy-lifting position she was unqualified to do, which resulted in a serious groin injury that rendered the plaintiff unable to work for six months, did not establish a hostile work environment claim); *Stacy v. Shoney's, Inc.*, 142 F.3d 436 (Table), at *1-3 (6th Cir. 1998) (stating in a sex discrimination case that a manager's numerous sexual comments, calling the plaintiff at home repeatedly to tell her that the manager "missed her," and touching the plaintiff's breasts did not meet the standard for hostile work environment).

Most cases of touching involve sex discrimination, and Williams does not allege that he was injured or that he was threatened or attacked in a violent manner. Furthermore, cases in which plaintiffs have established valid hostile work environment claims where physical contact or threats took place involve facts of substantially greater

severity than the facts Williams alleges in this case. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 651-55 (6th Cir. 1999) (plaintiff hearing supervisors discussing desire to fire minority employees and placing a star on their helmet for each minority fired, a supervisor telling the plaintiff's assistant that she was "working for a [n-word] now," attending a meeting where a supervisor stated that "we are up to our asses in [n-word] sludge," observing graffiti of lynching and "blacks out back," having to use acid valves that were sabotaged in order to create a safety hazard, and being physically attacked); *Hafford v. Seidner*, 183 F.3d 506, 508-10 (6th Cir. 1999) (supervisor threatening to fire the plaintiff, a corrections officer, and expressing concern of the plaintiff's effect on "my Aryan officers," a co-worker calling the plaintiff a "black-ass fucking [n-word]," and receiving numerous death threats, including "you wanta swing, bitch" and "you're dead"); *Barrett*, 556 F.3d at 519-20 (co-worker threatening to physically assault the plaintiff for reporting racially offensive language, the plaintiff being told not to "hang[] around with blacks" and "stay with her own kind" on a weekly basis for several years, having several job openings removed because the plaintiff applied for them, and, at an earlier point in time, a co-worker grabbing the plaintiff around the neck and told she should not be "hanging around any [n-words]"). In all, assuming the facts alleged in the complaint are true, *Ashcroft*, 556 U.S. at 678, and considering "the totality of the circumstances," *Randolph*, 453 F.3d at 733, Williams has not alleged a valid hostile work environment claim as a matter of law.

### ii. Grays

By contrast to Broderick and Williams, Grays has at least plausibly alleged a valid hostile work environment claim. Like Broderick and Williams, Grays observed

allegedly unprofessional interactions between CBP officers and African American travelers, and, in February 2020, Grays saw CBP officers racially profile a group of African American travelers in late model SUVs. (ECF No. 1, PageID.5.) According to the complaint, the travelers were treated disrespectfully "only because of their race." (*Id.*) In March 2020, Grays was instructed to stop an African American family driving white GM Suburban because it appeared "suspicious." (*Id.*) The complaint states that the stop would not have occurred to a Caucasian family. (*Id.*, PageID.6.)

In addition to these interactions with the traveling public, a supervisor allegedly questioned Grays several times a year since 2009 about Grays' employment: "Why are you here?"; "Why are you here at Blue Water Bridge in Port Huron, MI?"; "You're from Detroit, right? Why are you here?"; "How do you still have your job?"; "Why haven't you been fired yet?" (*Id.*, PageID.7-8.) From December 2009 until March 2021, the complaint alleges that at least four CBP supervisors sought to touch Grays' hair. (*Id.*, PageID.8.) Grays told the supervisors that the requests were racially offensive, but the supervisors persisted. (*Id.*) In 2018, an officer from the Michigan Department of Transportation ("MDOT") reported him to CBP officers as a "black man with a gun." (*Id.*) Although the report was facially erroneous, CBP officers kept an investigation into the report ongoing and "did not promptly close the matter." (*Id.*) In June 2020, a co-worker told Grays that if Grays changed into civilian clothes he could "blend in with protesters" and could "tell the protesters [his] name is Indike Mfufu." (*Id.*, PageID.9-10.) In April 2020, Grays was ordered to bring in a doctor's note to take a day of sick leave, despite the day being a regularly scheduled day off, and despite contracts and policies prohibiting Defendant from requiring medical documentation for sick days. (*Id.*,

PageID.11.) Grays asked his supervisor about the requirement for a doctor's note and CBP officers approached Grays and, in a confrontation, placed their hands on him. (*Id.*) The following day, CBP officials opened an investigation into Grays, revoked Grays' authority to carry a weapon, and placed him on desk duty. (*Id.*) The investigation remained ongoing up to the date Plaintiffs filed the complaint, and Grays has been placed at a desk next to a harassing supervisor. (*Id.*, PageID.12-13.) CBP supervisors have told Grays that he is prohibited from leaving his desk and must obtain approval to use the bathroom. (*Id.*)

The allegations of the discriminatory treatment Grays observed and experienced are far more frequent, long-lasting, and severe than the allegations concerning Broderick and Williams. The comments directed at Grays were more explicitly racial and derogatory, and Grays experienced far greater changes to his employment conditions. Notably, Grays was allegedly referred to as "Indike Mfufu," was twice wrongfully placed under investigation, and has been ordered to work at his desk and ask for permission to go to the bathroom. (ECF No. 1, PageID.7-13.) In addition, the complaint plausibly alleges that CBP officials have made offensive, and aggressive, physical contact with Grays many times over the course of many years, including by touching Grays' hair. (*Id.*) Assuming the truth of the allegations contained in the complaint, *Ashcroft*, 556 U.S. at 678, the complaint states a valid hostile work environment claim. Although the case is borderline, and approaches the level of the conduct described as insufficient to state a claim in *Barrett*, *Williams*, and *Phillips*, the court will not conclude as a matter of law, at

this early stage of the case, that a claim of hostile work environment is implausible.[2]
*Khalaf*, 973 F.3d at 485; *Ashcroft*, 556 U.S. at 678.

### C.  Title VII Retaliation

Grays brings a claim of Title VII retaliation. Title 42 U.S.C. § 2000e-3(a) states that it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice [under Title VII]." To state a *prima facie* claim of Title VII retaliation, a plaintiff must allege: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730-31 (6th Cir. 2014); *accord EEOC v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015).

Defendant argues that Grays' retaliation claim must be dismissed because he fails to plausibly allege that he "engaged in activity protected by Title VII," the first element of a Title VII retaliation claim. *Laster*, 746 F.3d at 730-31. (ECF No. 12, PageID.66.) The Sixth Circuit has emphasized that meaning of "protected activity," *Laster*, 746 F.3d at 730-31, and "oppos[ing] any practice made an unlawful employment practice," 42 U.S.C. § 2000e-3(a), is broad. "[T]he term 'oppose' being left undefined by [Title VII], carries its ordinary meaning: 'to resist or antagonize; to contend against; to

---

[2]    Discovery will allow the parties to further investigate the nature of Grays' employment conditions and the extent of his allegedly discriminatory work environment. With greater factual development, the court can better analyze the "the totality of the circumstances" and whether Grays has established a hostile work environment claim. *Randolph*, 453 F.3d at 733

confront; resist; withstand.'" *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) (quoting *Crawford v. Metropolitan Government of Nashville*, 555 U.S. 271, 276 (2009)). "Consistent with this expansive definition, [the Sixth Circuit has] held that 'the opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices.'" *Id.* (quoting *Laster*, 746 F.3d at 1067); *see also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (noting that "opposing conduct" under Title VII includes "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices").

Defendant argues that Grays' retaliation claim must be dismissed because the claim relies solely upon opposition to discrimination against the traveling public. (ECF No. 12, PageID.66-69.) It states that "opposition to the treatment of non-employees . . . is not protected by Title VII." (*Id.* (citing *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125 (2d Cir. 1999); *Crowley v. Prince George's Cnty.*, 890 F.2d 683 (4th Cir. 1989)).) The court need not resolve this issue because the complaint includes several allegations of Grays' opposition to discriminatory treatment of employees. The complaint states that CBP officers, including four supervisors, sought to touch Grays' hair, and Grays rebuked the requests due to the offensive racial undertones implicit in the requests. *See Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (quotations removed) ("[A] demand that a supervisor cease his/her harassing conduct constitutes protected activity covered by Title VII."). (ECF No. 1, PageID.8.) Grays alleges that he filed a formal Equal Employment Opportunity ("EEO") complaint of racial discrimination (*Id.*, PageID.10-11), and the parties agree that the earliest

protected conduct with regard to the EEO complaint occurred on April 8, 2020. (ECF

No. 15, PageID.122; ECF No. 16, PageID.157.) Finally, Grays alleged that he was

improperly directed to obtain a doctor's note to take sick leave. (ECF No. 1, PageID.11.)

The complaint states that Grays questioned and opposed this directive on April 8, 2020,

and he was soon thereafter placed on desk duty. (*Id.*) Thus, Grays has plausibly alleged

that he "engaged in activity protected by Title VII." *Laster*, 746 F.3d at 730-31.

Defendant argues that Gray has not exhausted administrative remedies for the

retaliation claim involving discrimination against him personally. (ECF No. 16,

PageID.158-59.) As the Sixth Circuit explained in *Randolph v. Ohio Department of*

*Youth Services*:

> A person seeking to bring a discrimination claim under Title VII in federal
> court must first exhaust her administrative remedies. This requirement
> exists so that the EEOC will have an opportunity to convince the parties to
> enter into voluntary settlement, which is the preferred means of disposing
> of such claims. The requirement, however, is not meant to be overly rigid,
> nor should it result in the restriction of subsequent complaints based on
> procedural technicalities or the failure of the charges to contain the exact
> wording which might be required in a judicial pleading. As a result, the
> EEOC complaint should be liberally construed to encompass all claims
> reasonably expected to grow out of the charge of discrimination.

453 F.3d at 731-32 (citations and quotations removed).

In his EEO complaint, Grays indicated that he intended to bring a "retaliation"

claim. (ECF No. 12-2, PageID.85.) Grays stated in the complaint that the retaliation

claim was "for reporting and opposing discrimination against others." (*Id.*, PageID.88.)

However, Grays also alleged that he was aggressively "touched" by CBP officials on

April 8, 2020 (*id.*), the day, according to the complaint, that Grays opposed his

supervisor's directive to obtain a doctor's note. (ECF No. 1, PageID.11.) Defendant

accepts that, in an informal EEO complaint Grays filed on April 8, 2020, he alleged that

he was touched on April 8, 2020, after "[he] tried to discuss why [a CBP supervisor] continue[d] to question [Grays'] integrity while not doing the same of white officers." (ECF No. 16-1, PageID.165.) In addition, Grays asserted in his formal EEO complaint that he "declined to allow [CBP supervisors] to touch his hair" due to "racial undertones." (ECF No. 12-2, PageID.89.)

Although Grays did not explicitly state that in his EEO complaints that he would bring a retaliation claim on the basis of discrimination directed against him, as opposed to the traveling public, such a claim was "reasonably expected to grow out" of the allegations made in Grays' EEO complaints. *Randolph*, 453 F.3d at 731-32; *see Dixon v. Ashcroft*, 392 F.3d 212, 217-18 (6th Cir. 2004) (holding that a Title VII plaintiff had exhausted a retaliation claim when he alleged facts underlying the claim but failed to state that he intended to bring a retaliation claim); *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490-91 (6th Cir. 2010) (quotations removed) ("[W]here facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim.").

Further, Grays alleges that he initiated a formal EEO complaint process. A Title VII claim that "can be reasonably expected to grow out of [an] EEOC charge" does not require administrative exhaustion. *Strouss v. Mich. Dept' of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001). Therefore, Title VII "[r]etaliation claims are generally excepted . . . because they usually arise after the filing of the EEOC charge." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998). Defendant asserts that the alleged retaliation occurred before Grays initiated the EEO complaint process (ECF No. 16, PageID.158-59), but the complaint alleges that, between May 2020 and March 2021,

29

Grays was assigned to desk duty, had his weapon revoked, was subject to harassment, and was told to ask permission before using the restroom. (ECF No. 1, PageID.12-13.) The parties agree that the EEO complaint process began in April 2020. (ECF No. 15, PageID.122; ECF No. 16, PageID.157.) Thus, Grays' retaliation claim has been properly exhausted, and Defendant's motion to dismiss on this issue will be denied.

### D. Additional Retaliation Claims

Plaintiffs did not amend their complaint in response to Defendant's motion to dismiss, and Plaintiffs have not asked the court to allow amendment of a claim or factual allegation currently contained in the complaint. However, Plaintiffs note that they intend, at some point, to add Title VII retaliation claims on behalf of Broderick and Williams after they complete administrative exhaustion. (ECF No. 15, PageID.137.) The only claims Broderick and Williams assert in the complaint are based on hostile work environment and § 1981, and dismissal of those claims is warranted.

Under Federal Rule of Civil Procedure 15(a), the court may give a party leave to amend its complaint. The court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Thus, the court will permit Broderick and Williams to amend their complaint within twenty-one days of this opinion to add their claims of Title VII retaliation. The amendment will not affect the court's disposition of Broderick's and Williams' hostile work environment and § 1981 claims, which will be dismissed.

### IV. CONCLUSION

As federal employees, Plaintiffs cannot bring claims of racial discrimination and retaliation under § 1981. In addition, Broderick and Williams fail to state a valid hostile

work environment claim as a matter of law. However, Grays adequately pled claims of Title VII disparate treatment, hostile work environment, and retaliation. Accordingly,

IT IS ORDERED that Defendant's Motion to Dismiss (ECF No. 12) is GRANTED IN PART and DENIED IN PART. It is GRANTED as to claims of Plaintiffs Broderick and Williams under Title VII racial discrimination (Count I) and § 1981 racial discrimination (Count III), and as to the claims of Plaintiff Grays under § 1981 discrimination (Count III) and § 1981 retaliation (Count IV). It is DENIED as to the claims of Plaintiff Grays under Title VII racial discrimination (Count I) and Title VII retaliation (Count II).

IT IS FURTHER ORDERED that Plaintiffs must file any amended complaint alleging Title VII retaliation claims on behalf of Plaintiffs Broderick and Williams by **August 20, 2021**.

s/Robert H. Cleland                              /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  July 29, 2021

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 29, 2021, by electronic and/or ordinary mail.

s/Lisa Wagner                                    /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\21-10526.GRAYS.MotiontoDismiss.RMK.docx