**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

JOHNNY GRAYS,

                Plaintiff,

v.                                             Case No. 21-10526

ALEJANDRO N. MAYORKAS,
Secretary of Homeland Security,

                Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Johnny Grays brings this action under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq*, alleging racial discrimination, hostile work environment,

and retaliation by officials of the Custom and Border Protection ("CBP"). Before the

court is Defendant's Motion for Summary Judgment. (ECF No. 44.) The motion has

been thoroughly – and extensively – briefed, and a hearing is not necessary. *See* E.D.

Mich. LR 7.1(f)(2). For the reasons stated below, the court will grant in part and deny in

part Defendant's motion.

## I.  BACKGROUND[1]

Plaintiff, an African American, currently works for CBP as an Officer ("CBPO") at

the Blue Water Bridge border in Port Huron, Michigan.[2] His chain of command has him

reporting to Supervisory CBPOs ("Supervisor"), Chief CBPOs ("Chief"), Watch

_____

[1]      Facts are presented in light most favorable to Plaintiff.

[2]      Unless otherwise indicated, the individuals in this Opinion and Order are non-African Americans.

Commanders, Assistant Port Directors, and the Port Director, who is assisted by a Chief of Staff.

### A.  April 7 Absence

In April 2020, at the beginning of the COVID-19 pandemic, Blue Water Bridge CBPOs received a new work schedule, which, according to Plaintiff, was confusing and not well-explained. (ECF No. 51-2, PageID.1418.) This new schedule consisted of three consecutive workdays, two consecutive regular days off, and two consecutive days of "weather and safety" leave. (*Id.*) Under this schedule, Plaintiff was to work on April 1-3, be off on April 4-5; and take weather and safety leave on April 6-7. (*Id.*)

On April 6, Supervisor Chester Dumanois informed Plaintiff that all weather and safety leave had been canceled, that the old schedule returned, and that Plaintiff needed to report for his shift the next day. (*Id.*, PageID.1420.) Plaintiff initially told Dumanois that he would be at work; however, after checking his schedule, he realized that April 7 was his regular day off. (*Id.*) Plaintiff called Dumanois back regarding his day off. Dumanois replied, "Okay, Well, if you're off, you're off." (*Id.*) Plaintiff said, "Okay" and hung up the phone. (*Id.*)

Consequently, Plaintiff did not report to work for his assigned shift on April 7. (*Id.*, PageID.1422, 1424.) Supervisor Michael Bruen, who was responsible for the CBPOs' time and attendance on Plaintiff's shift, notified the on-duty Chief, Andrew Beaudry, of Plaintiff's absence. (ECF No. 51-5, PageID.1592.)

Unaware that Plaintiff was scheduled to have a regular day off, Beaudry contacted Dumanois to confirm there was no misunderstanding that Plaintiff knew he was supposed to be at work. (ECF No. 51-5, PageID.1567, 1592, 1583, 1597.) In his

deposition, Beaudry "d[id] not recall" if Dumanois told him about the second conversation he had with Plaintiff on April 6 and said he "did not know" about it. (*Id.*, PageID.1593-94.)

According to Beaudry, management tried to get hold of Plaintiff on April 7 without success. (*Id.*, PageID.1567.) Ultimately, Bruen reached out to Plaintiff's wife, who said that she and Plaintiff had a doctor's appointment with their son that day. (ECF No. 51-2, PageID.1421.) Nonetheless, suspecting Plaintiff of leave abuse,[3] Beaudry requested Plaintiff to substantiate his absence with a doctor's note. (ECF No. 51-5, PageID.1592; ECF No. 51-2, PageID.1422.) Plaintiff sent Bruen an email confirming the doctor appointment, and Beaudry approved Plaintiff's leave request. ((ECF No. 51-2, PageID.1422; ECF No. 44-9; ECF No. 51-5, PageID.1592.)

### B.  April 8 Altercation

On April 8, while walking into work, Plaintiff told Chief of Staff Chantel Lasky, "When you see that piece of shit Beaudry, you tell him I want to talk to him." (ECF No. 51-2, PageID.1428.) Lasky asked for details, to which Plaintiff said that he wanted to ask why Beaudry continued to question his integrity. (*Id.*) Per Plaintiff, he might have used the term "fucker." (*Id.*) Plaintiff claimed he was in a mood no different than any other day. (*Id.*)

Plaintiff said that later in the morning, he walked up to Beaudry in the Supervisor's Office "like he would walk over to anyone," and, in his "normal voice",

---

[3]     Beaudry said he based his suspicion on Dumanois' confirmation and the fact that Plaintiff only gave notification several hours after his shift. (ECF No. 51-5, PageID.1592.) Beaudry also claimed that all employees were told to be readily available to be recalled for work if they were scheduled for weather and safety leave. (*Id.*)

asked, "Why are you questioning my integrity?" (ECF No. 51-2, PageID.1429-30.)
Plaintiff said during the encounter, he repeated this question multiple times, specifically
every time Beaudry "raised his voice to . . . attempt to talk over [Plaintiff]." (ECF No. 51-
2, PageID.1450.)

While inside the office, Plaintiff took two or three steps toward Beaudry, and
Beaudry backed up. (*Id.*, PageID.1431.) Plaintiff did not recall if Beaudry was backed up
against a wall. (*Id.*) Beaudry put his hand up and touched Plaintiff's body armor. (*Id.*,
PageID.1429-30.) Plaintiff said in total, Beaudry touched him three times, but there was
no other physical issue. (*Id.*, PageID.1431.) Beaudry also did not push or hurt Plaintiff.
(*Id.*)

After Beaudry touched Plaintiff, the conversation became "colorful" and "loud."
(*Id.* at PageID.1429.) Plaintiff told Beaudry, "Don't touch me, motherfucker." (*Id.*,
PageID.1429-30.) Beaudry asked Plaintiff to have a seat, to which he responded, "I
don't need to have a seat" and "Don't touch me," in "colorful language" – "[a]sshole or
cocksucker, something along those lines." (*Id.*, PageID.1429-30.)

Plaintiff said he looked at Supervisors Douglas Blanton and Bradley Moore, who
were present, and remarked, "Hey, you see him touching me," also in "colorful
language." (*Id.*, PageID.1430.) At that point, Beaudry uttered, "Get back," and
immediately went into an "IFI stance." (*Id.*, PageID.1430.)[4] Beaudry also said, "Stop.
Quit walking up on me" or "quit touching me." (*Id.*) According to Plaintiff, instead of
letting the situation escalate, he decided to walk away after Beaudry touched him the

---

[4]    The court is unfamiliar with what is an "IFI stance," as it is not explained. (ECF
No. 51, PageID.1281.)

third time. (*Id.*, PageID.1431.) However, Plaintiff also testified that, at one point, Moore stuck his arm between Plaintiff and Beaudry to separate them in an attempt to de-escalate the situation. (*Id.*, PageID.1431-32.)

When Plaintiff tried to leave, Beaudry yelled "Get back here. Get back in the office." (*Id.*, PageID.1432.) Plaintiff believed that, despite being dismissive at first, Beaudry "wanted to continue with his theatrics" and wanted to turn "a situation that hadn't escalated to anything other than the unwanted touching" and "colorful language" into something else. (*Id.*, PageID.1433.)

Plaintiff admittedly raised his voice during the encounter. (*Id.*, PageID.1450.) He admitted calling Beaudry a "fucking cocksucker," an "asshole," a "fucking piece of shit," and possibly "a shithead," while Beaudry did not "cuss at [Plaintiff] or call [him] any names." (*Id.*, PageID.1430.)

### C.  Management's Initial Response

After the incident in the Supervisor's Office, Beaudry went to Assistant Port Director Gerald Little's office. (ECF No. 51-5, PageID.1561-62.) Per Little, Beaudry said that, while he was holding a briefing with two supervisors, Plaintiff "stormed into the office kind of in a range, swearing, and tried to get in his face." (ECF No. 51-10, PageID.1836, 1837.) Little did not recall being told that Plaintiff touched Beaudry. (*Id*, PageID.1837.)

While Beaudry and Little's accounts differ as to what exactly happened next in Little's office, it is agreed that Little summoned Plaintiff and removed his gun. (ECF No. 51-5, PageID.1562; ECF No. 51-10, PageID.1836-37.) [5] Plaintiff was professional to

---

[5]      Little did not secure Beaudry's weapon. (ECF No. 51-10, PageID.1837.)

Little during this process, but Little still wanted to assess Plaintiff's state of mind to make sure everyone was safe. (ECF No. 51-10, PageID.1836-37, 1867.) Little said that he "didn't know to what extent, how long, maybe just for the day, but at that point[, he] needed to figure out what was going on." (*Id.,* PageID.1836-37.)

Per Plaintiff, while he was in Little's office, he told Little that Beaudry was "an inept, out-of-control chief who doesn't like black people, running around causing chaos." (ECF No. 51-2, PageID.1398.)

After Plaintiff and Beaudry left his office, Little went to then-Port Director Michael Fox's office to report the incident. (ECF No. 51-10, PageID.1838; ECF No. 51-7, PageID.1710.)[6] Therein, the Office of Professional Responsibility ("OPR") was contacted. (ECF No. 51-10, PageID.1839; ECF No. 51-7, PageID.1721.) Shortly thereafter, OPR Agents arrived at the Port, where they spoke with CBP management, and collected evidence. (ECF No. 51-26, PageID.2065-66, 2083-84; ECF No.51-38, PageID.2288-89.) They did not speak to Plaintiff or gather information from him. (ECF No. 51-26, PageID.2067-68. 2075.)

### D.  Plaintiff Formally De-Armed and Placed on Restricted Duty

After OPR arrived, Plaintiff was brought back up to Little's office, where he was issued a letter, signed by Little, advising him that his authority to carry a government-issued firearm was temporarily revoked pending the outcome of the OPR investigation. (ECF No. 51-10, PageID.1854; ECF No. 44-15, PageID.1040.)

---

[6]    Fox remembered Little brought it to his attention that day but did not remember what Little said. (ECF No. 51-7, PageID.1710.)

There is some confusion as to who made the firearm revocation decision. When asked if he was the one that revoked Plaintiff's authority to carry a firearm, Little admitted to be "a part of the process," but he "[did not] know if [he] was specifically the one." (ECF No. 51-10, PageID.1832.)[7] Little further testified that he does not "ultimately have the authority to revoke a weapon," which instead rests with the Port Director or Director of Field Operations. (ECF No. 51-10, PageID.1856.) While not denying the possibility of being the decision maker, Fox said that he does not recall making the decision to remove Plaintiff's firearm. (ECF No. 51-7, PageID.1722.) Fox also does not remember the exact timing of the revocation decision or if he discussed it with anyone else. (*Id.*) Regardless, per Fox, Plaintiff's gun was removed "[b]ecause of the nature of the complaint," but he does not know what about approaching Beaudry and uttering expletives required Plaintiff's gun to be taken away. (*Id.*, PageID.1701-02.)

Undisputedly, Plaintiff was also placed on restricted duty on April 8. (ECF No. 44, PageID.889; ECF No. 51, PageID.1322.) However, there is again confusion as to who made the formal decision to do so. In his deposition, Little denies being the one who formally placed Plaintiff on restricted duty but does admit to discussing that action with Fox, who had the ultimate decision-making power. (ECF No. 51-10, PageID.1831.) Little further did not know if he personally informed Plaintiff of his restricted duty status. (*Id.*) Meanwhile, Fox testified that he did not know who placed Plaintiff on restricted duty and

---

[7]     In his deposition, Little was confronted with an "EEO Counselor's Report," which said that "APD Little stated on April 8, 2020, he did revoke the authority for [Plaintiff] to carry his service weapon." (ECF No. 51-31, PageID.2136.) When asked if he disputed that report, Little responded, "I don't know." (ECF No. 51-10, PageID.1832.) Little also responded, "I don't know" to whether his memory was refreshed by the document, but said, "We're all part of the process." (*Id.*)

does not remember if it was him. (ECF No. 51-7, PageID.1702, 1722.) Fox suggested that either he, Calhoun, or Little could have been the decision maker. (*Id.*) Fox testified that Plaintiff was on restricted duty because he did not have his weapon while the investigation was pending. (ECF No. 51-7, PageID.1701.)

Plaintiff remained without a firearm and on restricted duty until July 2021. Plaintiff claims that, while on restricted duty, he could not perform the full scope of his CBPO duties (ECF No. 51-12, PageID.1894-95.) He was further ineligible for overtime, physical fitness time (three hours per week), overseas duties, and change of assignment. (ECF No. 51-2, PageID.1442-43.) Little denied having the authority to give Plaintiff's weapon back while the OPR investigation was pending. He further testified that he and Fox never discussed the return of Plaintiff's weapon (ECF No. 51-10, PageID.1840, 1855), while Fox testified to not knowing why Plaintiff was on restricted duty for over a year. (ECF No. 51-7, PageID.1701.)

### E.  OPR Investigation

As part of the investigation, OPR interviewed eight witnesses: Plaintiff, Beaudry, Little, Moore, Dumanois, Haeck, Lasky, and Blanton. (ECF No. 51-38, PageID.2286.)[8] During his interview, Plaintiff said that, at first, he approached Beaudry normally. (ECF No. 51-39, PageID.2325-2326.) The situation only got escalated when Beaudry touched Plaintiff. (*Id.*) Plaintiff admitted that he walked up to Beaudry and said, "why are you keep questioning my integrity, motherfucker." (*Id.*, PageID.2326.) Plaintiff claimed it was because Beaudry "had also escalated." (*Id.*, PageID.2337.) Plaintiff admitted to using

---

[8]     All witnesses were placed under oath at the beginning of their interviews and informed of the criminal penalty for lying to a federal agent. (*See e.g.,* ECF No. 51-39, PageID.2310; ECF No. 51-22, PageID.2007; ECF No. 51-20, PageID.1996.)

additional expletives, "up to and including asshole, cocksucker," but "those weren't the initial." (*Id.*, PageID.2326.)

Moore, who was present during the April 8 incident, told the interviewers that he was initially not concerned when Plaintiff first entered the room and addressed Beaudry. (ECF No. 51-22, PageID.2009, 2011.) He only looked up when Plaintiff's voice raised. (*Id.*; *see also id*, PageID.2015.) Moore said knowing the involved individuals "pretty well," he did not find that Plaintiff posed a threat. (*Id.*, PageID.2012.) However, when asked:

> Did you feel that, attempting to remove a personal relationship you may have with Officer Grays and/or Chief Beaudry, did you feel, if you were an objective supervisor sitting in the seat you were sitting in, that Officer Grays was threatening Chief Beaudry?

Moore responded, "Yes. His behavior would have been threatening. Yep." (*Id.*, PageID.2016.)

Blanton, who witnessed Plaintiff's interaction with Beaudry alongside Moore, stated that it "was like an intimidation thing." (ECF No. 51-20, PageID.1998.) Blanton indicated that Plaintiff "wasn't bladed, [and] it was almost like squared off, just almost like face to face." (*Id.*, PageID.1998.) Per Blanton, every time Beaudry stepped back, Plaintiff took a step forward, though he did not "rush" and the movement was not "fast." (*Id.*, PageID.1998, 2000.) Blanton further indicated that when it "finally got to the point where [Beaudry] was cornered," Beaudry put his arm out, and Plaintiff walked into it saying , "don't fucking touch me." (*Id.*, PageID.1998.) Blanton stated that he did not think Plaintiff was going to hit Beaudry, but the situation "got to the point where . . . it seemed threatening and intimidating and they needed to be separated." (ECF No. 51-20, PageID.1999-2000; *id.*, PageID.2002.)

On September 25, 2020, OPR issued a report of its investigation ("ROI"), making

the following findings:

> ALLEGATION ONE: One April 8, 2020, CBPO GRAYS aggressively
> approached CCBPO Beaudry while yelling profanity and continued
> advancing toward CCBPO Beaudry after CCBPO Beaudry repeatedly told
> CBPO GRAYS to stop; SUSTAINED.
>
> ALLEGATION TWO: On April 8, 2020, CBPO GRAYS yelled at CCBPO
> Beaudry while on duty, calling him a "mother fucking cock sucker" and
> "fucking piece of shit" numerous times; SUSTAINED.
>
> ALLEGATION THREE: On April 8, 2020, CBPO Grays accompanied
> SCBPO Chantel Lasty from the 10th Street parking lot to the Port Huron
> POE and told SCBPO Lasky that CCBPO Beaudry questioned his integrity
> and that he "wanted to talk to that fucker"; SUSTAINED.

(ECF No. 51-38, PageID.2287.)

A tracking sheet indicated receipt of the ROI by CBP management on February

11, 2021. (ECF No. 51-35, PageID.2153.) However, in a letter dated February 24, 2021,

Plaintiff was informed that the investigation into the April 8, 2020 incident is "[r]emains

open." (ECF No. 51-34.)

### F.  February 2021 AWOL

In February 2021, Plaintiff made a variety of requests to CBP management

regarding his work arrangements. They included: a telework position due to the severity

of COVID-19 and its heightened risk to African Americans; an exemption to CBP's in-

door mask requirement; and leave without pay until a decision was made on the first

two requests. (ECF Nos. 44-22, 44-23, 44-24.) On February 17, 2021, Plaintiff's leave

request was approved. (ECF No. 51-44, PageID.2443.) The next day, Chief of Staff

Lasky sent Plaintiff an email, indicating:

> Regarding our phone conversation February 17, 2021 this email is being
> sent to both your work and personal email addressed. Your request for
> Leave Without Pay (LWOP) from 0700-1000 February 17, 2021 was

10

approved by PD Fox. I have attached a screen shot of your EMS schedule for your records. As discussed, you are scheduled to report to work for your midnight shift on February 22, 2021.

(ECF No. 44-24, PageID.1136.)[9] Plaintiff was also asked to provide additional information for the consideration of his medical requests. (*Id.*)

On February 19, Plaintiff travelled to Aruba, where his wife was stationed, with a plan to return on February 28. (ECF No. 44-25.) On February 22, Plaintiff wrote to Lasky: "I'm in contact with my primary care provider. They will address the agencies [sic] request as soon as reasonable. I am requesting WSL [weather safety leave] or Telework until a determination is made." (ECF No. 44-26, PageID.1143.) In response, Lasky wrote in relevant part:

> Weather and Safety Leave and/or Telework are not appropriate in this situation. You may request LWOP or annual leave until such time a decision is made . . .
>
> In anticipation of a call with you today I reached out to Port Director Fox about any leave requests you might have. Port Director Fox has approved you to take LWOP or annual leave until such time that a decision regarding your request is reached. If you elect to take LWOP or annual leave until a decision is made, it would prevent you having to call the port prior to each scheduled shift.
>
> If you choose to take LWOP or annual leave until a decision is made you must email me and let me know which type of leave you request (LWOP, annual leave, or a combination of both). I would reach out to you when a decision is made to inform you of the updated status . . .

(*Id.*, PageID.1142.) In response, Plaintiff wrote, "I'll take whatever leave, being offered Caucasian officers [sic] at Port Huron who have underlying medical conditions." (*Id.*,

---

[9]    In her deposition, Lasky said that "[a]t some point during the back-and-forth conversation," she was aware that Fox had approved Plaintiff's LWOP request pending a decision on his medical requests on February 17. (ECF No. 51-11, PageID.1905.) Lasky did not remember why she asked Plaintiff to request leave again on February 22, but insisted that "something had to have occurred that led [her] to believe [Plaintiff] wasn't electing the LWOP again." (*Id.*, PageID.1906.)

PageID.1141.) Lasky forwarded Plaintiff's email to Fox, who wrote, "This is him saying

we are racist and that is not acceptable." (ECF No. 51-45, PageID.2445.) After Lasky

informed Plaintiff that he would be placed on annual leave for his February 23 shift,

Plaintiff indicated that he would "request LWOP until a decision is made to prevent

calling in nightly." (ECF No. 44-26, PageID.1141.)

On February 23, Lasky contacted Plaintiff to inform him that his mask exemption

was conditionally approved and that he was to report to work on his next scheduled shift

on February 24. (ECF No. 51-45, PageID.2448-49; ECF No. 44-29, PageID.1148.)

Plaintiff did not report to work, claiming that he did not receive the communication due

to unreliable service and blaming insufficient notice time. (ECF No. 51-2, PageID.1446.)

On February 24, Lasky reached out to Plaintiff again and directed him to report to his

scheduled shift on February 25 at midnight or be marked absent without leave (AWOL).

(ECF No. 44-29, PageID.1148.) Plaintiff also did not report for this day. He was charged

AWOL for missing work on February 24 and 25. (ECF No. 51-2, PageID.1446.)

Plaintiff did not inform anyone at CBP that he was going to Aruba or that he could

not report to work on February 24 or 25. (ECF No. 51-2, PageID.1446.)

### G.  Plaintiff's Suspension

CBP's disciplinary procedures involve two steps: a proposal by the proposing

official and a final decision by the deciding official. (ECF No. 44, PageID.883; ECF

No.51, PageID.1307.) A "Table of Offenses and Penalties" serves as a guideline in

assessing the appropriate penalties for misconduct. (ECF No. 51-8, PageID.1766; ECF

No. 51-43, PageID.2404.) For a first offense of "abusive, slanderous, malicious,

derogatory, goading, or otherwise inappropriate language, gestures, or conduct to or

about co-workers," a penalty ranging from a written reprimand to a three-day

suspension is recommended.[10] (ECF No. 44-20, PageID.1129.) For a first offense of

AWOL from two to five workdays, the recommended penalty is a five-day suspension

with a mitigated range of a one-to-four-day suspension.[11] (ECF No. 44-34,

PageID.1169.)

Initially, Little was the proposing official in Plaintiff's case, which concerns both

his behavior on April 8, 2020 and AWOL in February 2021. Little testified that he

reviewed the case file, looked at the Table of Offenses, and worked with Mike Mahany,

the Labor and Employee Relations ("LER") representative.[12] (Id., PageID.1860.) Initially,

Little came up with a 14-day suspension, but Mahany recommended a 7-day

suspension instead, and Little "was good with that." (Id.; ECF No. 51-36.)[13] Little said

that Mahany performed the "likes and similars" for the recommendation, though Little

does not know what Mahany reviewed. (ECF No. 51-10, PageID.1860.) Mahany,

---

[10]    According to the Table of Offenses and Penalties effective June 21, 2002, which
applies to Plaintiff's April 2020 conduct.

[11]    According to the Table of Offenses and Penalties effective December 9, 2020,
which applies to the February 2021 AWOL charge.

[12]    Little said that in most instances, he conversed with Mahany over the phone.
(ECF No. 51-10, PageID.1861.)

[13]    In his deposition, Mahany testified that he does not remember having any
conversations with Little as to Plaintiff's discipline, though he acknowledged receiving
an email from Little. (ECF No. 51-43, PageID.2412.) Having reviewed the transcript
excerpts cited by Plaintiff, the court did not find where "Mahaney [sic.] denied it was his
idea to propose a 7-day suspension." (ECF No. 51, PageID.1313.) Similarly, the court
could not locate where in the record that "Mahaney [sic.] testified that he never spoke
with Little about the proposed discipline." (ECF No. 51, PageID.1313.) In his deposition,
Mahany consistently stated that he does not remember if he spoke with Little. (ECF No.
51-43, PageID.2412, 2416.) Mahany could only recall speaking about Plaintiff with
Lasky, Calhoun, and Everett, but he also admitted that he could have spoken to others.
(ECF No. 51-43, PageID.2411, 2422.)

however, does not recall reviewing the comparables for Plaintiff or providing them to CBP management. (ECF No. 51-43, PageID.2427.)

Before Plaintiff's proposal letter was finalized, Little became Acting Port Director and could not serve as both proposing official and the deciding official. (ECF No. 51-10, PageID.1860; ECF No. 51-9, PageID.1804.) Accordingly, Assistant Port Director Gary Calhoun became the proposing official. (*Id.*) Calhoun reviewed the ROI, the sustained charges, the AWOL records, and all other materials relied upon to confirm that the pending proposed 7-day suspension[14] was within the confines of the Tables of Offenses and Penalties. (ECF No. 51-9, PageID.1805, 1086.)[15] Calhoun did not review materials outside the package he received, like Plaintiff's performance reviews, nor did he make any independent investigation of the underlying facts or have further discussions with LER. (*Id.*, PageID.1807, 1808-09, 1810-11, 1812-13, 1815.)

There is no dispute that Mahany ultimately prepared the proposal letter, but witness testimonies conflict as to how it came about. Calhoun said the letter was written by LER after deliberation with Little. (ECF No. 51-9, PageID.1803, 1805-06, 1812-13.) On the other hand, Mahany said that Calhoun mentioned wanting to move forward with

---

[14]   Calhoun stated that he was not involved in coming up with the original 7-day suspension proposal. (ECF No. 51-9, PageID.1805.)

[15]   Plaintiff's Response asserts that "[a]lthough Calhoun testified that the situation on April 8, 2020 'could have been handled so many different ways; . . . it . . . minimized the credibility of both parties. . .', only Plaintiff was disciplined." (ECF No. 51, PageID.1317.) The court has reviewed the relevant portion of Calhoun's deposition, and finds that Calhoun was referring to how Plaintiff interacted with Beaudry when he said "It could have bene handled so many different ways." (ECF No. 51-9, PageID.1815.) Additionally, when Calhoun said, "it mitigated or minimized the credibility of both parties," he was alluding to the negative effects of the altercation, which "happened in front of everyone," to the working environment, not attributing fault to both Plaintiff and Beaudry as seemingly suggested by Plaintiff's Response. (ECF No. 51-9, PageID.1815.)

14

the 7-day suspension proposal [16] and Mahany prepared the proposal letter accordingly. (ECF No. 51-43, PageID.2414; ECF No. 51-43, PageID.2418.) Regardless, Calhoun signed and issued the proposal letter on July 13, 2021, recommending a 7-day pay and duty suspension for Plaintiff due to substantiated charges of unprofessional conduct and AWOL. (ECF No. 44-36.)

On October 12 and 13, 2021, Plaintiff submitted two written responses. (ECF No. 44-37, PageID.1182; ECF No. 51-51, PageID.2468.)[17] He alleged that the proposed discipline was racially discriminatory and harassing and was done in retaliation against him for engaging in protected activities. (*Id.*)

In October 2021, Watch Commander Scott Everett, who is an African American, became Acting Port Director at the Port of Port Huron. (ECF No. 51-8, PageID.1736, 1738.)[18] By virtue of this role, Everett become the deciding official on Plaintiff's discipline. (*Id.*, PageID.1749.) In formulating his decision, Everett testified to reviewing the OPR report, the emails pertaining to the AWOL, Table of Offenses, and the standards of conduct. (ECF No. 51-8, PageID.1749, 1750.) He also went over Plaintiff's response and the twelve *Douglas* factors[19] with Mahany. (*Id.*; ECF No. 51-43,

---

[16]     Mahany could not recall the specific details of this conversation. (ECF No. 51-43, PageID.2414.)

[17]     Plaintiff had timely expressed his intention to provide a reply to the proposal letter. (ECF No. 44-37, PageID.1180.) However, his response was delayed because CBP agreed to put that on abeyance while the union was involved. (*Id.*, PageID.1179-80.) After the union ceased its representation of Plaintiff, he was asked to submit his written reply. (*Id.*).

[18]     Everett was in this role until January 2022. (ECF No. 51-8, PageID.1736.)

[19]     These are the factors a deciding officer must consider in imposing a penalty on an employee, including "[m]itigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad

PageID.2434-36.)[20] Per Everett, Mahany confirmed that Everett's intended penalty was consistent with those imposed on other employees, though he was not provided with specific comparators. (ECF No. 51-8, PageID.1758.)[21] Ultimately, on December 6, 2021, Everett sustained the charges against Plaintiff but mitigated the proposal to a four-day suspension. (ECF No. 44-38.) He said, "I combined the unprofessional with the AWOL and came up with my decision of the – after going through all the other stuff, came up with my decision of the four days." (ECF No. 51-8, PageID.1762.)[22]

## II.  STANDARD

To prevail on a motion for summary judgment, a movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presenting evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that fact

---

faith, malice or provocation on the part of others involved in the matter." (ECF No. 44-20, PageID.1127-28.)

[20]     Plaintiff's Response asserts that "[Mahany] and Everett discussed Plaintiff's claim of race discrimination and retaliation 'in some form or fashion' but Mahaney [sic.] did not tell Everett that, if true, they would be mitigating factors weighing in favor or a lesser penalty." (ECF No. 51, PageID.1319.) This does not accurately reflect Mahany's testimony. In his deposition, Mahany repeatedly said that he did not recall the specifics of his discussion with Everett when they ran through the *Douglas* factors. (ECF No. 51-43, PageID.2435, 2436.)

[21]     As indicated above, Mahany did not remember reviewing the comparable for Plaintiff or providing that to CBP management. (ECF No. 51-43, PageID.2427.)

[22]     The court has reviewed the excerpt of Everett's deposition transcript cited by Plaintiff (ECF No. 51-8, PageID.1758) and does not find support for the assertion in his brief that "[Everett] admitted that the alleged wrongdoing did not impact Plaintiff's ability to perform his duties." (ECF No. 51, PageID.1321.) Therefore, it is not included as part of the factual background.

would establish or refute an essential element of the claim "and would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013). There is no requirement that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility' of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

For a court to deny summary judgment, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "The essential question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (internal quotations omitted). All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

## III. DISCUSSION

Plaintiff brings claims of discrimination, retaliation, and hostile work environment under Title VII. The court starts its analysis with the first two claims, which share the same familiar burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), summarized as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." . . . Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802-04). *See Laster v. City of Kalamazoo,* 746 F.3d 714, 730 (6th Cir. 2014) (applying this framework to retaliation claim).

In so doing, the court examines these claims with respect to two undisputed adverse employment actions taken against Plaintiff: (1) having his gun removed and being put on restricted duty,[23] and (2) being suspended.[24] *See Nemeth v. Citizens Fin.*

---

[23]     It is undisputed that Plaintiff was put on restricted duty simultaneously to the removal of his firearm, and that Plaintiff was released from restricted duty at the same time his gun was returned to him. Defendant also proffers the same justification for these measures. (*See* ECF No. 44, PageID.879.) Thus, the court will review them collectively as one adverse employment action.

[24]     Plaintiff also ostensibly claims that he was discriminated because he was subject to OPR investigation. However, the Sixth Circuit has said that "employer investigation into suspected wrongdoing by employees, standing alone, generally do not constitute adverse employment actions." *Arnold v. City of Columbus*, 515 F. App'x 524, 531 (6th Cir. 2013) (citing cases); *Bivins v. U.S. Pipe & Foundry Co.*, 48 Fed. Appx. 570, 572 (6th Cir. 2002) ("[M]ere investigations by an employer do not constitute adverse employment actions.").

*Grp., Inc.,* No. 2:08-CV-15326, 2011 WL 2531200, at *7 (E.D. Mich. June 24, 2011)

(Borman, J.) (analyzing adverse employment actions separately).

### A. Discrimination/Retaliation– Firearm Removal and Restricted Duty

### 1. Prima Facie Case of Discrimination

With respect to the prima facie case of discrimination, the parties dispute only the

fourth element – that Plaintiff was treated differently from similarly situated non-African

American employees. (ECF No. 44, PageID.899-900; ECF No. 51, PageID.1341.) "[T]he

requirements for finding a similarly situated comparator are not so onerous." *Redlin v.*

*Grosse Pointe Pub. Sch. Sys.,* 921 F.3d 599, 606 (6th Cir. 2019) (citing cases). To

qualify as similarly situated, the comparator employee "must be similar in all of the

relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th

Cir. 1998). Generally, this means that:

> . . . the individuals with whom the plaintiff seeks to compare his/her
> treatment must have dealt with the same supervisor, have been subject to
> the same standards and have engaged in the same conduct without such
> differentiating or mitigating circumstances that would distinguish their
> conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992). However, exact correlation

is not required. *Ercegovich,* 154 F.3d at 352.

Here, among others, Plaintiff compares himself to CBPO Michael Taylor, who got

in an altercation with CBPO George Brown in July 2020. (ECF No. 51, PageID.1342-

43.) In that instance, Brown alleged that Taylor got upset over Brown's joke that Taylor

was a "big kid" when he tried to pry off a crate's lid with a crowbar during an inspection.

(ECF No. 51-55, PageID.2480.) Taylor was reported being insistent on not letting go of

the matter, "glaring at [Brown] and staring [him] down," and "exhibiting what [Brown]

interpreted as pre-assault indicators, [including] [s]taring [Brown] down, face flushed,

eyes wide open, breathing heavy (huffing and puffing)" (*Id.*) When Brown told Taylor

that he was making Brown uncomfortable, Taylor responded sarcastically and called

Brown "a Snowflake" and "something else like sissy, punk, bitch." (*Id.*) Taylor then

suggested that they settle the matter on the parking lot, to which Brown told Taylor that

he felt threatened. (*Id.*, at PageID.2481.) Taylor continued suggesting that they step

outside, meanwhile maintaining similar "pre-assault indicators." (*Id.*, PageID.2481.)

Later, when Brown looked back at Taylor, Taylor was still glaring, and "began thrusting

his head, shoulders and upper chest in [Brown's] direction,"[25] while telling Brown, "Do

you wanna go?! Let's do this! Are we gonna do this?! Let's go! Come on, let's go! I

wanna do this!" (*Id.*) Brown indicated that "Taylor had done everything he could, short of

actually striking [Brown], to initiate a violent altercation[,] [i]ncluding standing in

[Brown's] way and obstruct [his] movement around the crate and interfering with [his]

completion of the inspection." (*Id.*) When asked to move, Taylor refused, and "hovered

around [Brown] menacingly." (*Id.*)[26]

Defendant seeks to differentiate Plaintiff from his alleged comparators by

claiming that they did not engage in similar conduct of comparable seriousness. (ECF

No. 44, PageID.900.) However, viewing in the light most favorable to Plaintiff, he has

presented sufficient evidence of disparate treatment when he had his gun removed and

was put on restricted duty after the April 8th incident. To distinguish the incident

---

[25]     Brown described that these were "short, abrupt, violent thrust." (*Id.*)

[26]     A witness to this event indicated that Taylor was "harassing" and "hostile" toward
Brown, that Taylor was "verbally assaulting" Brown and "staring at [him] in an
intimidating manner," and that Taylor did ask Brown "if he wanted to step outside." (ECF
No. 51-55, PageID.2484.) The witness added that Taylor's "demeanor implied [that] he
was attempting to escalate the confrontation to one of a physical nature."

between Brown and Taylor and that between Plaintiff and Beaudry, Defendant first focuses on the ultimate findings – via an investigation – that the allegations of workplace harassment or threats of physical violence against Taylor were unsubstantiated and that he only used "slanderous, goading and inappropriate language to a co-worker." (ECF No. 44, PageID.900-01.) However, these findings did not exist at the time CBP management first became aware of the incident. Thus, they could not be why – unlike Plaintiff – Taylor, who was the alleged aggressor, did not have his firearm taken away or was not put on restricted duty pending further OPR investigation.

Additionally, Defendant claims that Plaintiff's action was not sufficiently similar to Taylor's because it was directed at a supervisor rather than a co-worker. (*Id.*, PageID.901.) However, a factual question exists as to how the identity of the alleged victim actually factored into the decision to remove Plaintiff's gun and put him on restricted duty.[27] Little did not testify that he removed Plaintiff's gun because Plaintiff's actions were directed toward a supervisor; instead, Little said he wanted to assess Plaintiff's state of mind for safety concerns. (ECF No. 51-10, PageID.1836-37, 1867.) Likewise, according to the April 8, 2020 letter, Plaintiff's gun was removed because "[t]he allegations [against Plaintiff] cause[d] [CBP management] to have serious questions regarding whether [Plaintiff] may compromise the safety and security of [him]self, others and/or the agency and whether [Plaintiff was] able to exercise the judgment and safety required to carry a firearm." (ECF No. 44-15, PageID.1040.) A reasonable jury can find the same "serious questions" concerning safety and judgment

---

[27]    Defendant points to Calhoun's concern with "rank structure" over the April 8, 2020 incident. (ECF No. 44, PageID.901.) However, nothing in the record indicates that Calhoun played a role in removing Plaintiff's gun and put him on restricted duty.

present in the case of Taylor, who was alleged to exhibit aggressive and threatening behaviors toward another CBP employee.

In short, Plaintiff has sufficiently raised a genuine issue of material fact regarding the similarly situated element to establish a prima facie case of discrimination based on the removal of his gun and his restricted duty placement.

### 2.  Prima Facie Case of Retaliation

Defendant's Motion argues that Plaintiff cannot establish the causation element of a prima facie of retaliation based on the removal of his weapon and his placement on restricted duty because they happened before Plaintiff engaged in a protected activity. (ECF No. 44, PageID.913.) However, Plaintiff responds that, on April 8, before having his gun officially removed and being put on restricted duty, he complained to Little that Beaudry was "an inept, out-of-control chief who doesn't like black people, running around causing chaos." (ECF No. 51-2, PageID.1398; ECF No. 51, PageID.1365.) In his Reply, Defendant does not refute that this statement could constitute a protected activity. (ECF No. 56, PageID.2780.)[28] Instead, Defendant claims that "an intervening reason for an adverse action that occurs after protected activity 'dispels an inference of retaliation based on temporal proximity.'" (*Id.*) (citations omitted). Yet, Defendant's Reply fails to specify what was the "intervening reason" for taking away Plaintiff's gun and putting him on restricted duty. (*Id.*) It cannot be, as asserted in Defendant's Motion, Plaintiff's "misconduct of April 8, 2020," which had happened before Plaintiff complained

---

[28]     Consequently, the court need not resolve whether Plaintiff's opposition to racial profiling against the traveling public in February and March 2022 constituted a protected activity, because there is no serious dispute that Plaintiff engaged in a protected activity before the removal of his gun and his placement on restricted duty. (ECF No. 44, PageID.912).

to Little about Beaudry, or his "subsequent AWOL," which happened after the adverse action at issue (ECF No. 44, PageID.914.).

Therefore, the court is left with a situation "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity [and] such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

### 3.  Pretext

The burden now shifts to Defendant to proffer a non-discriminatory reason for the adverse action taken against Plaintiff. Defendant claims that CBP management removed Plaintiff's firearm and placed him on restricted duty initially to ensure workplace safety and continued the action until it could ascertain Plaintiff's ability to exercise the judgment and safety required to carry a weapon. (ECF No. 44, PageID.879, 904.) This proffered reason is legitimate and non-discriminatory. Thus, to survive summary judgment of his discrimination and retaliation claims based on the removal of his firearm and being put on restricted duty, Plaintiff needs to raise a genuine issue of material fact that Defendant's articulated reasons are pretextual. *Texas Dep't of Cmty. Affs.*, 450 U.S. at 253.

The Sixth Circuit has explained how pretext can be proven:

Plaintiffs typically show pretext in one of three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action." *Chen* [*v. Dow Chemical Co.*], 580 F.3d [394,] 400 [(6th Cir. 2020)]. But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer [take the adverse action against] the employee

23

> for the stated reason or not?'" *Tingle v. Arbors at Hilliard*, 692 F.3d 523,
> 530 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400). So plaintiffs remain
> free to pursue arguments outside these three categories. Even so, a
> plaintiff must articulate some cognizable explanation of how the evidence
> she has put forth establishes pretext.

*Miles v. S. Cent. Hum. Res. Agency, Inc.,* 946 F.3d 883, 888 (6th Cir. 2020). In

determining whether pretext exists, it is not the court's role to "act as a super personnel

department that second guesses employers' business judgment." *Gunn v. Senior Servs.*

*of N. Ky.*, 632 F. App'x 839, 848 (6th Cir. 2015). Indeed, "[w]hen an employer

reasonably and honestly relies on particularized facts in making an employment

decision, it is entitled to summary judgment on pretext even if its conclusion is later

shown to be 'mistaken, foolish, trivial, or baseless.'" *Tingle*, 692 F.3d at 531 (citing

*Chen*, 580 F.3d at 401).

Here, Plaintiff has marshalled sufficient evidence to raise a triable issue of

pretext. First, a material factual question exists as to who decided to remove Plaintiff's

gun and place him on restricted duty. *See Coburn v. Rockwell Automation, Inc.,* 238 F.

App'x 112, 122 (6th Cir. 2007) (holding that the identity of the individual who first

recommended plaintiff on the RIF list was a material fact); *Tinker v. Sears, Roebuck &*

*Co*, 127 F.3d 519, 523 (6th Cir. 1997) ("The inconsistency of these statements by the

different managers ... creates two important questions of material fact: *who was actually*

*responsible for the decision to fire Tinker,* and what was the reason that caused that

decision maker to decide that Tinker should be fired? These inconsistencies

demonstrate that there is a genuine issue of material fact regarding Sears's proffered

reason for Tinker's termination.") (emphasis added). Defendant's Motion refers to Little

as the decisionmaker. (ECF No. 44, PageID.879, 904, 906-07.) However, Plaintiff has

pointed to Little's testimonies diverting the ultimate decision-making authority to Fox, who does not recall or remember making the decisions. (ECF No. 51-10, PageID.1831, 1832, 1856.) "A reasonable jury could infer that if [the employer] cannot even give a straight answer about who [was the decision maker], it is trying to hide something." *Coburn*, 238 F. App'x at 122.

Additionally, a material factual question exists as to why Plaintiff was kept without a service firearm and on restricted duty for over a year. Little attributed the time length to the pending investigation. (*See* ECF No. 51-10, PageID.1840.) However, it is indisputable that Plaintiff's carry authorization was not reinstated until months after the OPR investigation had been concluded and CBP management had received the findings. No concrete reason for the delay was provided. (ECF No. 51-7, PageID.1701; ECF No. 51-10, PageID.1866.) A reasonable jury can find CBP management's purported desire to ascertain Plaintiff's ability to exercise judgment and safety through an investigation to not be the actual or sufficient motivation behind their decision to remove Plaintiff's gun.

Thus, Defendant is not entitled to summary judgment on Plaintiff's claims of race discrimination and retaliation arising from Plaintiff's gun removal and restricted duty.

### B.  Discrimination/Retaliation – Suspension

The court next addresses Plaintiff's claims of discrimination and retaliation related to his suspension. The court need not address the parties' disputes over Plaintiff's ability to prove the prima facie case, because Plaintiff's failure to show the pretext of the proffered legitimate reasons is dispositive of these claims.

Plaintiff admits to approaching and uttering profanity toward Beaudry on April 8, 2020 and not reporting to work on February 24-25, 2021. (ECF No. 51, PageID.1353.) However, he refutes the sincerity of these proffered reasons behind his suspension. He points to the following: (1) identity of the decisionmaker, (2) exaggerated accounts of events and responses by CBP officials, (3) violations of internal policies, (4) favorable treatment to Caucasian CBPOs, and (5) discriminatory workplace atmosphere and practices. As explained below, these arguments fail.

### 1.  Decisionmaker Identity

Unlike with the removal of Plaintiff's gun and his placement on restricted duty, there is no factual question as to the identity of the individual who made the decision to suspend Plaintiff. Undisputedly, it was Everett who put Plaintiff on suspension for 4 days.

Nonetheless, Plaintiff claims, as evidence of pretext, that "no one took the responsibility for . . . proposing a 7-day suspension against Plaintiff" (ECF No. 51, PageID.1355; *see also id.,* PageID.1361.) The record is not that obscure. Little testified that he accepted Mahany's 7-day suspension suggestion. (ECF No. 51-10, PageID.1860.) While Mahany did not remember speaking to Little (ECF No. 51-43, PageID.2412.), he did not refute that possibility (*id*, PageID.2411, 2422.).[29] Additionally,

---

[29]     A witness's memory lapse by itself is not evidence of pretext. *See Block v. Meharry Med. Coll.,* 723 F. App'x 273, 282 (6th Cir. 2018) (saying witness's statement that he could not remember the whole situation "do not suggest that it is 'more likely than not' that the employer's explanation is a pretext, or cover up' for discrimination."); *Benn v. Peake*, No. 1:07-CV-854, 2010 WL 5691647, at *8 (S.D. Ohio Dec. 27, 2010) (finding decisionmaker's failure to recall details from an event nearly a year prior was not evidence of pretext).

Calhoun took the responsibility for signing off and issuing the letter proposing a 7-day suspension for Plaintiff. (ECF No. 51-9, PageID.1803.)

Even if a question exists as to who first came up with the 7-day suggestion, its materiality is minimal because Plaintiff acknowledges that "[t]he proposal and final decision letters are the last word on what Plaintiff was disciplined for." (ECF No. 51, PageID.1345.) Uncontrovertibly, Calhoun and Everett took responsibility for issuing these letters. Plaintiff has offered no evidence that Calhoun and Everett relied on the preexisting 7-day proposal in coming up with their decisions. In fact, Calhoun sustained the 7-day suspension proposal and Everett issued the 4-day suspension decision from their independent reviews of the matter. (ECF No. 51-9, PageID.1805, 1086; ECF No. 51-8, PageID.1762.)[30] *Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008) (collecting cases) (explaining that, "when a decisionmaker makes a decision based on an independent investigation," the retaliation inquiry focuses on the motivations of that decisionmaker); *cf. Kirkland v. City of Maryville, Tenn.*, 54 F.4th 901, 912 (6th Cir. 2022).

## 2.  Factual Basis

Plaintiff also argues that pretext could be established because the factual basis for the suspension decision was "intentionally trumped up" or inadequate. (ECF No. 51, PageID.1356-57, 1361.) However, even if there were exaggerations and the facts turn out to be incorrect, Plaintiff cannot show pretext so long as the decision makers acted on their "honest belief in [their] justifications based upon reasonable reliance 'on the

---

[30]     In his deposition, Calhoun responded, "No, absolutely not" when asked if he "just assume[d] that LER had done their job and . . . [was] okay with [the proposal letter]." (ECF No. 51-9, PageID.1805.)

particular facts that were made before [them] at the time the decision was made." *Parks v. UPS Supply Chain Sols., Inc.,* 607 F. App'x 508, 514 (6th Cir. 2015) (citation omitted). Plaintiff "is required to show 'more than a dispute over the facts upon which the [suspension] was based." *Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d 274, 285 (6th Cir. 2012) (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001)). As said by the Sixth Circuit, "We have not required that the employer's decision-making process under scrutiny 'be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

To rebut the honest belief rule, Plaintiff "must offer some evidence of 'an error on the part of the employer that is too obvious to be unintentional.'" *Hale v. Mercy Health Partners*, 617 F. App'x 395, 399-400 (6th Cir. 2015). Here, Plaintiff has not offered any evidence demonstrating such a noticeable wrong. No evidence suggests that Calhoun and Everett did or should doubt the trustworthiness of the recorded accounts of events and findings presented to them. For example, Plaintiff spends a significant portion of his Response criticizing the OPR investigation. (ECF No. 51, PageID.1296-1307.) However, Plaintiff has not proffered any evidence showing that Calhoun or Everett knew or should have known of OPR investigator's alleged bias and deficiency. *See Neview v. D.O.C. Optics Corp.,* 382 F. App'x 451, 459 (6th Cir. 2010) (upholding the district court's no-pretext finding from plaintiff's claim that her co-workers exaggerated events to have her discharged, because "there [was] no indication that [d]efendant doubted the credibility of the description of events").

28

### 3.  Policies and Procedures

Next, Plaintiff points, as evidence of pretext, to Port management's alleged failures to follow or inconsistent application of its policies and practices. (ECF No. 51. PageID.1356.) "[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *Miles,* 946 F.3d at 896 (citing *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005). However, pretext may be shown by the disparate application of the policy. *Id.* (rejecting the argument that the defendant's failure to follow internal policy demonstrated pretext where plaintiff failed to show any employee, "let alone one outside the protected class, against whom [defendant]'s policy was applied differently"); *Sims-Madison v. Dana Com. Vehicle Mfg., LLC*, No. 21-5706, 2022 WL 898770, at *4 (6th Cir. Mar. 28, 2022) (rejecting plaintiff's policy-violation arguments because she "marshalled no evidence – such as disparate application of the [collective bargaining agreement ("CBA")] policy – suggesting that [defendant's] reason for failing to follow the CBA was her race or age").

Plaintiff takes issue with the reporting of the April 8 incident to OPR, claiming that it violated OPR guidelines as to what "should <u>not</u> be reported." (ECF No. 51, PageID.1358; ECF No. 51-24, PageID.2039-40) (underline in original).) However, Plaintiff has offered no evidence showing that the suggestive non-reporting guidelines were disparately applied – i.e., when OPR were *not* called in a similar or more severe situation. *Miles,* 946 F.3d at 896. Plaintiff also quarrels with the timeline of his OPR investigation, but he has not refuted that it can be extended beyond the sixty-day period. (ECF No. 44, PageID.909; ECF No. 51, pageID.1358; ECF No. 56,

PageID.2778.) Thus, the deviation from standard OPR investigation time length does not suggest pretext as a matter of law.

As to the disciplinary process, Plaintiff claims that the procedures were not followed because deciding officials failed to consider the "likes and similars" in coming up with Plaintiff's discipline. (ECF No. 51, PageID.1342.) However, Little testified that in coming up with the seven-day suspension recommendation, Mahany performed an analysis of the "likes and similars." (ECF No 51-10, PageID.1860.) Similarly, Everett testified that he went over his decision with Mahany, who confirmed that it was comparable with what had been done before. (ECF No. 51-8, PageID.1766.) While Mahany did not remember performing the "likes and similars" analysis at his deposition ((ECF No. 51-43, PageID.2427), that alone does not fulfill Plaintiff's burden to present evidence showing a genuine issue of material fact. *See Gilbert v. City of Chicago,* 404 F. Supp. 3d 1215, 1219 (N.D. Ill. 2019) ("Defendants correctly point out that there is a difference between 'not remembering and affirmatively stating something did not happen.'") Plaintiff has offered no other evidence raising a triable issue of fact that the "likes and similars" analysis was not considered as in other cases.

### 4. Disparate Treatment

Additionally, Plaintiff posits that pretext exists because he was treated more harshly than similarly situated CBPOs who are Caucasians or have not complained about race discrimination. (*See* ECF No. 51, PageID.1359-62.) This is a recognized method to prove that the proffered legitimate reason was insufficient to motivate the adverse employment action. *Miles*, 946 F.3d at 893. As with the prima facie stage, Plaintiff must show that the individuals to whom he compares himself are similarly

situated – "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 893 (citation omitted). "Failure to satisfy these requirements, however, does not automatically destroy comparator status and plaintiffs need not show an exact correlation between themselves and others similarly situated." *Id.* But, at the pretext stage, Plaintiff must show that his comparables engaged in "substantially identical conduct," which demands a "closer correlation" than that at the prima facie stage. *Id.*

To be clear, the "substantially identical" language does not increase Plaintiff's burden of proof, but only means that "the factual inquiry proceeds to a new level of specificity." *Jackson v. VHS Detroit Receiving Hosp., Inc.,* 814 F.3d 769, 780 (6th Cir. 2016). "The relevant inquiry is whether the comparator's conduct was substantially identical 'in all of the *relevant* aspects.'" *Id.* at 782 (emphasis in original). "The relevant aspects in this context include the type of misconduct alleged and its relative severity." *Spratt v. FCA US LLC*, 812 F. App'x 348, 354 (6th Cir. 2020) (citing *Jackson*, 814 F.3d at 780, 783). Courts "gauge the relative severity of the plaintiff's and comparator's misconduct, in part, by looking to its actual and potential consequences." *Id.* (citing *Jackson*, 814 F.3d at 780).

Here, Plaintiff has not been able to point out any employees with a similar combination of the misconduct that he had. The instant case is similar to *Greene v. U.S. Dep't of Veterans Affs.,* 605 F. App'x 501 (6th Cir. 2015). There, a female nurse was terminated because of rude and disrespectful behavior toward patients and an AWOL

incident. *Id.* at 503. To show that the reasons for her termination were pretextual, plaintiff contended that male nurses accused of multiple instances of misconduct were treated more favorably. *Id.* at 508. "For instance, she point[ed] to one male nurse who was charged with both AWOL and failure to accurately document progress notes but received only a reprimand." *Id.* She also claimed that "[a]nother male nurse was charged with rude and unprofessional behavior towards a co-worker, disrespectful behavior and use of obscene language toward a patient, and violating Hospital policy but also only received a reprimand." *Id.* In finding that plaintiff was not able to show disparate treatment, the Sixth Circuit endorsed the district court's finding that plaintiff's "actions [were] a combination of different types of misconduct, but her comparables appear[ed] to have engaged in one form of misconduct or the other." *Id.* Specifically, "[n]one of the male employees ha[d] a charge of rude and disrespectful behavior toward patients combined with a charge of AWOL." *Id.* Here, like in *Green*, the alleged comparators either engaged in unprofessional conduct or had attendance issues, but none were found to engage in both. Thus, they are not similarly situated as Plaintiff, thereby foreclosing disparate treatment as a basis for a reasonable jury to find pretext.

### 5.  Discriminatory Atmosphere

Finally, Plaintiff asserts that the tolerance of racial animus in the workplace is evident of pretext. (ECF No. 51, PageID.1362-63.) According to the Sixth Circuit:

> Circumstantial evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.

*Risch v. Royal Oak Police Dep't,* 581 F.3d 383, 392 (6th Cir. 2009) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 356 (6th Cir. 1998)). "This is true even when remarks are made by a nondecisionmaker, or fail 'to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment.'" *Bartlett v. Gates,* 421 F. App'x 485, 491 (6th Cir. 2010) (citing *Risch,* 581 F.3d at 393). However, "courts must carefully evaluate factors affecting the statement's probative value, such as the declarant's position in the [employer's] hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action, as well as whether the statement buttresses other evidence of pretext." *Risch,* 581 F.3d at 393. "'[I]solated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding' of unlawful discrimination." *Block v. Meharry Med. Coll.,* 723 F. App'x 273, 281–82 (6th Cir. 2018) (quoting *Parkhurst v. Am. Healthways Servs., LLC*, 700 Fed. App'x 445, 450 (6th Cir. 2017)).

Plaintiff points to alleged racial profiling of travelers by CBP officers as additional evidence of discrimination. However, "[i]t is well-settled that a plaintiff who relies on circumstantial evidence of racial animus to show pretext must show some nexus between the circumstantial evidence and the decision to [take adverse action against] him." *Mayes v. City of Oak Park*, No. 05-CV-74386-DT, 2007 WL 9751967, at *16 (E.D. Mich. Sept. 28, 2007) (Rosen, J.), *aff'd*, 285 F. App'x 261 (6th Cir. 2008) (citations omitted). Here, Plaintiff was not subject to racial profiling while crossing borders, and the lack of a causal nexus between the alleged discriminatory border inspection practices and his suspension is "[t]he fatal flaw in Plaintiff's argument." *Id.* (rejecting

plaintiff's attempt to show additional evidence of discrimination by pointing to allegedly racially discriminatory ticketing or arrest practices on the part of the public safety department, because plaintiff was not a victim of such activities). Similarly, Plaintiff has not connected the alleged racial statements by non-CBP individuals and CBP non-supervisory employees to his suspension, particularly when nothing indicates that these events were made known to management.

Plaintiff also asserts statements claimed to be evidence of racial animus by CBP managers, but "the circumstances surrounding each statement and their content fail to provide evidence of a discriminatory atmosphere or support Plaintiff's theory of pretext." *Block,* 723 F. App'x at 282. For instance, Plaintiff claims that Beaudry "sen[t] messages to other supervisors calling non-white individuals 'animals' and exhorting them to 'pick up a gun against them.'" (ECF No. 51, PageID.1363.) Having reviewed the 2009-2010 emails, the court finds that the quoted language was taken out of context. The exchanges dealt with upsetting images of violent threats and crimes associated with extreme beliefs with little to nothing to do with race.[31] Plaintiff also interprets Lasky's questions about him working in Port Huron when he was from Detroit to denote racial animus, but the court finds nothing racially suggestive other than Plaintiff's subjective beliefs that "are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992). As to the

---

[31]     Several images depict a child having his arm crushed by a car for stealing bread (ECF No. 51-15, PageID.1940-43); others show protestors with signs advocating for violence, including "Slay those who insult Islam," "Behead those who insult Islam," "Exterminate those who slander Islam," "Islam will dominate the world," "Freedom go to hell," "Europe. Take some lessons from 9/11," and "Europe you will pay. Your 9/11 is on its way!!" (*Id.*, PageID.1947-51).

situation "heard" by an employee about Lasky calling the police on a "mysterious-looking black man" in the employee parking lot, this is a hearsay rumor unworthy of any credence.[32]

Similarly, Plaintiff relies on the accusation by a Watch Commander that Calhoun compared her supervision to that of a "slave master." (ECF No. 51, PageID.1363-64.) However, this accusation is uncorroborated[33] and is insufficient in establishing Calhoun's motivation in dealing with Plaintiff. *Gilbert v. City of Shaker Heights,* 43 F.3d 1472 (6th Cir. 1994) (holding that plaintiff's uncorroborated statement of supervisor referring to herself as a "master" and her African American subordinates as her "slaves" insufficient in establishing the employer's motivations in firing plaintiff).

Additionally, Plaintiff took issue with Fox's statement in an email to Lasky that "[t]his is him saying we are racist and that is not acceptable." (ECF No. 51-45.) This statement needs to be put in the appropriate context. In February 2021, Plaintiff's request to be absent from work pending a decision on his accommodation requests was granted. (ECF No. 51-45, PageID.2446.) Plaintiff was then asked by Lasky to elect a type of leave for his approved accommodation request to be absent from work. (*Id*.) Rather than responding with the kind of leave he wanted to take, Plaintiff wrote, "I'll take whatever leave []being offered [to] Caucasian officers at Port Huron who have underlying medical conditions." (ECF No. 51-45, PageID.2445.) In this context, a reasonable jury can view Fox's "unacceptable" remark as referring to what he perceived to be unwarranted accusation of racism by Plaintiff, rather than indicative of

---

[32]    The employee specifically said that he "d[oes not] know if [this story is] factual or not." (ECF No.51-62.)

[33]    Calhoun denied saying this. (ECF No. 51-9, PageID.1778.)

discriminatory or retaliatory attitudes. Moreover, while "discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext," *Risch*, 581, F.3d at 393, no evidence shows that Fox's statement, made in February 2021, was related to Everett's decision to suspend Plaintiff in October 2021, and thus it does not establish pretext. *Blizzard v. Marion Tech. Coll.,* 698 F.3d 275, 287 (6th Cir. 2012) (holding that the district court correctly held that purported age-related comments do not establish pretext because they were unrelated to the decision to dismiss the plaintiff).

In summary, Plaintiff has not shown a genuine issue of material facts regarding the sincerity of why he was suspended. His discrimination and retaliation claims arising from his suspension will accordingly be dismissed.

### C. Hostile Work Environment

To succeed on a claim of racially hostile work environment claim under Title VII, 42 U.S.C. § 2000e-2(a)(1), a plaintiff must demonstrate that

> (1) []he belonged to a protected group, (2) []he was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transp. Co.,* 643 F.3d 502, 511 (6th Cir. 2011).

### 1. Based on Race

In assessing Plaintiff's hostile work environment claim, the court may consider "only harassment *based on [P]laintiff's race*." *Id.* (emphasis in original). "A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)). "Harassment is based

on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist to qualify." *Id.* (citing *Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 706 (6th Cir. 2007)). Additionally, the analysis is limited "to those events that were either perceived by [Plaintiff] or that [he] knew about." *Berryman v. SuperValu Holdings, Inc.,* 669 F.3d 714, 717 (6th Cir. 2012).

As explained above, Plaintiff has not demonstrated that OPR investigation into to the April 2020 incident, his suspension, and Lasky's questions of why Plaintiff works in Port Huron were racially motivated. Plaintiff has also failed to show how most of the alleged "racial harassment directed at Plaintiff" is race related. (ECF No. 51, PageID.1372-73.) Specifically, Plaintiff has offered no race-based indication behind Beaudry's question of his April 7 absence. While Plaintiff asserts that other Caucasian CBPOs did not report to work on that day and one officer was not asked to provide a doctor note (ECF No. 51, PageID.1279), nothing indicates that Beaudry was aware of these absences.[34]

Similarly, what Plaintiff contends constitutes a hostile work environment while on restricted duty (ECF No. 51, PageID.1322-24, 1373) also lacks the requisite racial relevance. For instance, Plaintiff claimed that he was harassed because he was not permitted to work remotely, but he points the court to nothing in the record evidencing that the work he was assigned to do "is typically a remote position," let alone one done by officers of different races. (ECF No. 51, PageID.1322, 1373.)

---

[34]    Beaudry denied knowing that CBPO Jeremy Hannan called in on April 7 and 8 to use family sick leave and was not asked to provide a note. (ECF No. 51-5, PageID.1567.)

Plaintiff also claims that he was harassed because:

- Plaintiff's desk location was on the same floor as Beaudry's office that is shared with two other supervisors (ECF No. 51-2, PageID.1439; ECF No. 51, PageID.1373)[35];

- Lasky told Plaintiff to use the facilities in the cargo building where he worked, rather than in a separate building. (ECF No. 51-2, PageID.1441-42; ECF No.51, PageID.1373);[36]

- A supervisor asked Plaintiff to let her know if he needed to use the restroom or get water, so she knew where he was (*Id.*);

- After Fox relocated Beaudry to the passenger building, he instructed the managers, if encountering Plaintiff in the passenger building, to tell him to go back to the cargo building "as that was what the [Port Director] had set up to address [Plaintiff's] concerns" and to document the times Plaintiff was seen and told to return to his work area (ECF No. 51-54, PageID.2476-77.)[37]

The court sees no racial connotations from these events, nor has Plaintiff offered any explanation therefor.

---

[35]    Plaintiff's and Beaudry's schedules overlapped approximately two to three days per week for four hours or less, during which they would see each other "coming and going," but did not have any confrontation. (ECF No. 51-2, PageID.1440.)

[36]    Plaintiff said that, to avoid being in the same space as Beaudry and to stretch his legs, he often used the restroom in a different building, known as the "passenger building." (*Id.*, PageID.1441.)

[37]    In September 2020, Plaintiff asked Fox to separate his and Beaudry's workspaces. (ECF No. 51-2, PageID.1440; ECF No. 51-53.) Fox granted Plaintiff's request on September 9, and relocated Beaudry to the passenger building, which was satisfactory to Plaintiff. (ECF No. 51-2, PageID.1440.) Fox told the managers and Plaintiff that Plaintiff was expected to remain in the cargo building "to continue minimizing any unnecessary contact with Beaudry." (ECF No. 51-54, PageID.2476-77.)

Consequently, what Plaintiff asserts as harassment that can plausibly be considered race-based are:

- between 2009 and 2021, hearing or perceiving six specific incidents of different treatment toward African American travelers at the border;[38]

- in 2018, being subjected to a false report of a "Black man with a gun" by a non-CBP individual, and jokes thereabout among CBP coworkers for a few days (ECF No. 51, PageID.1417);

- in 2020, being told by a coworker, who commented on his hair, that he could blend in with those protesting racial discrimination by law enforcement and tell them his "very African-typical-sounding" name (ECF No. 51-2, PageID.1408);

- between April 8, 2020 and July 13, 2021, having his gun removed and being placed on restricted duty; and

- while on restricted duty, having his hair touched (once) and almost touched (twice) by coworkers who described it as "spiky or pointy" and asked Plaintiff how he manages and brushes it (ECF No. 51-2, PageID.1415-17).[39]

---

[38]    Plaintiff claims in his response that he "has adduced evidence of more than 14 specific incidents of racial profiling and harassment of black travelers and coworkers, at least 7 of which occurred between 2019 and 2022, some on 'numerous' occasions." (ECF No. 51, PageID.1371.) The court has reviewed the records and facts cited by the parties and found only 4 specific traveler-related incidents perceived by Plaintiff occurring in 2009 (related to Beaudry's remark), 2017 (related to CBPO Aaron Haeck), February 2020 (related to CBPO Schwander), March 2020 (related to Beaudry). Plaintiff was told by CBPOs Jermaine Broderick and/or Mikal Williams about two additional incidents in October 2020 and February 2021. (ECF No. 51-2, PageID.1404, 1406). Plaintiff also offered the account of CBPO Steven Techlin regarding two instances in approximately 2011 or 2012, but he did not observe these incidents or learn about them until his deposition. (ECF No. 51-2, PageID.1406-07).

[39]    Even though Plaintiff claims that he told several white coworkers to not touch his hair over the year (ECF No. 51, PageID.1340, 1373), Plaintiff admitted in his deposition that the only people who attempted to touch his hair that he took an issue with was

## 2.  Severe or Pervasive

Having determined what were the alleged racially harassing incidents, the court

now assesses whether their totality was "sufficiently severe or pervasive to alter the

conditions of his employment and create an abusive working environment." *Williams,*

643 F.3d at 512 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1992)).

> Factors to consider include "the frequency of the discriminatory conduct;
> its severity; whether it is physically threatening or humiliating, or a mere
> offensive utterance; and whether it unreasonably interferes with an
> employee's work performance." [*Harris*, 510 U.S.] at 23, 114 S.Ct. 367.
> Significantly, "isolated incidents (unless extremely serious) will not amount
> to discriminatory changes in the 'terms and conditions of employment.' "
> *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141
> L.Ed.2d 662 (1998). Occasional offensive utterances do not rise to the
> level required to create a hostile work environment. *Grace v. USCAR,* 521
> F.3d 655, 679 (6th Cir.2008). "To hold otherwise would risk changing Title
> VII into a code of workplace civility, a result we have previously rejected."
> *Id.* (internal quotation marks omitted).

*Williams*, 643 F.3d at 512–13. "This standard sets a high bar for [Plaintiff] in order to

distinguish meaningful instances of discrimination from instances of simple disrespect."

*Khalaf v. Ford Motor Co.*, 973 F.3d 469, 485 (6th Cir. 2020).

Plaintiff's experiences are insufficiently severe or pervasive to support his hostile

work environment claim. The Sixth Circuit has rejected the same claims brought by

employees who experienced more serious, and more consistent, discriminatory

---

Denise Dupuis and Kelly Hollins. (ECF No. 51-2, PageID.1415, 1417.) Plaintiff did not
believe that Hollins knew that there was any type of race issue with touching his hair
before she attempted to touch it, and she never tried to touch his hair again. (ECF No.
51-2, PageID.1416). On the same day Hollins tried to touch his hair, Plaintiff supposed
that Dupuis actually touched his hair; after being told not to as a racial sensitive issue,
Dupuis stopped and laughed it off, but then made another attempt a few days later. (*Id.*)
Regarding their comments, Plaintiff believed that Hollins and Dupris "thought [that] they
were complimenting [him] on his hair," even though he did not think what they said was
compliments. (*Id.*)

treatments. For example, in *Williams,* the supervisor told plaintiff that "she was a Democrat only because she was a black woman," stated that "this country should get rid of Jesse Jackson and Al Shaprton [famous African American figures] because without those two monkeys the country would be a whole lot better," said to plaintiff that "she would not have to pay for her education because she was a single black mother" if she returned to school, asked her "why black people cannot name their children stuff that people can pronounce, like John or Sue," and expressed to her that "black people should go back to where they came from." 643 F.3d at 506. The court held that these statements were "certainly insensitive, ignorant, and bigoted," but they did not create a jury question on the plaintiff's racially hostile work environment claim. *Id.* at 513.

Further, in *Phillips v. UAW Int'l*, 854 F.3d 323 (6th Cir. 2017), a union employee indicated that a union officer listed representatives by name and single out African Americans as those he would fire. *Id.* at 325. Another union officer told plaintiff that they "need[ed] to put a black on staff" and asked if plaintiff was interested. *Id.* In plaintiff's presence, a union officer told another African American employee, "Oh, because you're big and black . . . [y]ou're her bodyguard, I'm supposed to be afraid of you." *Id.* The officer also said that "the problem with the Union was that there are too many blacks in the union." *Id.* In addition, plaintiff stated that the officer at issue "often behaved violently, . . . made frequent racial comments, and . . . spoke in a condescending tone when dealing with black union members as compared to white members." *Id.* Plaintiff observed the officer separating union grievances into "black" and "white" piles and heard him saying that "he intended to withdraw the grievances filed by African-American union members." *Id.* While being "offensive and condemnable, these incidents did not

meet the "relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Id,* at 328.

More recently, in *Singleton v. PSA Airlines, Inc.,* No. 21-3423, 2022 WL 875869 (6th Cir. Mar. 24, 2022), a training instructor asked plaintiff if she just "rolled out of bed" because she wore an afro hairstyle to class, touched plaintiff's hair and called it unusually soft because "black people only wear weaves and glue," stated he's "not racist because he has black members in his family," and said one of the plaintiff's classmates was "so black" that "the only thing he could see was [the classmate's eyes and teeth." *Id.* at *2. The court held that "[n]o reasonable juror could find [the plaintiff] suffered racial harassment severe or pervasive enough to alter the terms, conditions, or privileges of employment." *Id.*

In light of the Sixth Circuit precedent, the actions perceived by or directed at Plaintiff do not rise to the high bar of severity or pervasiveness requisite for a hostile work environment claim. The perceived harsher treatments toward African American public travelers – not directed at Plaintiff – have "diminishe[d] . . .  severity" and are "afforded less weight." *Strickland v. City of Detroit,* 995 F.3d 495, 506-08 (6th Cir. 2021). The other incidents by a non-CBP individual and coworkers amount to no more than "[o]ccasional offensive utterances and "isolated incidents" of insufficient seriousness. *Williams*, 643 F.3d at 512-13. While the removal of Plaintiff's gun and his placement on restricted duty could support Plaintiff's discrimination and retaliation claims, such actions do not make Plaintiff's workplace "permeated" with "ridicule and insult" that was "severe and pervasive" such that it created an "abusive working environment." *Harris*, 510 U.S. at 21. *See Simon v. Harris Cnty. Sheriff's Dep't*, No. CIVA H-08-2111, 2010

42

WL 1463459, at *5 (S.D. Tex. Apr. 12, 2010) (holding that placement on transitional duty, and later restricted duty, which allegedly resulted in restriction on job opportunities were not so severe and pervasive as to constitute an actionable hostile work environment); *Hampshire v. Philadelphia Hous. Admin.,* No. CV 17-4423, 2019 WL 652481, at *10 (E.D. Pa. Feb. 14, 2019), *aff'd sub nom. Hampshire v. Bard,* 793 F. App'x 75 (3d Cir. 2019) (granting summary judgment of plaintiffs' hostile work environment claim arising from being placed on restricted duty pending an investigation during which time they worked at a desk, performed no patrol duties, and had their gun reclaimed); *Rugg v. City of New York,* No. 18 CIV. 9762 (LAP), 2019 WL 3242493, at *6 (S.D.N.Y. July 8, 2019) (holding that reassignment, failure to promote, and placement on restricted duty desk "do not rise to the level of alleging a hostile work environment").

## IV. CONCLUSION

In summary, Defendant is not entitled to summary judgment for claims arising out of the weapon removal and placement of Plaintiff on restricted duty. Plaintiff raised triable issues regarding the similarly situated element to establish a prima facie case of discrimination and the causation element to establish a prima facie case of retaliation. Plaintiff also proffered sufficient evidence showing pretext – particularly the dubiety surrounding who made the decision and why Plaintiff was kept without a service weapon and on restricted duty months after the investigation into his conduct on April 8, 2020 had concluded.

However, Defendant is entitled to summary judgment for claims arising out of Plaintiff's suspension because Plaintiff has not offered evidence showing that Defendant's legitimate business reasons for suspending Plaintiff was pretextual.

Defendant is also entitled to summary judgment for Plaintiff's hostile work environment claim because Plaintiff has failed to establish sufficiently severe and pervasive race-based harassment.

Accordingly, IT IS ORDERED that "Defendant's Motion for Summary Judgment" (ECF No. 44) is GRANTED IN PART and DENIED IN PART.

s/Robert H. Cleland                                    /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 16, 2023

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 16, 2023, by electronic and/or ordinary mail.

s/Lisa Wagner                                          /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\NTH\Civil\21-10526.GRAYS.MSD.NH.v5.docx